*City of Hyattsville, et al. v. Prince George's County Council, et al.*, No. 1261, Sept. Term 2020. Opinion by Arthur, J.

**LAND USE – MARYLAND-WASHINGTON REGIONAL DISTRICT ACT – JURISDICTION OF DISTRICT COUNCIL**

The Maryland-Washington Regional District Act (RDA), which covers most of Montgomery County and Prince George's County, allocates certain land use functions between the county planning boards and the district councils. The RDA authorizes the district council to grant zoning map amendments. The RDA provides that the county planning boards have exclusive jurisdiction to make recommendations to the district council with respect to zoning map amendments.

Section 27-548.26(b)(1)(B) of the Prince George's County Code allows an owner of property in the development district overlay zone to request changes to the underlying zone of the property or to the list of allowed uses. Under this provision, the Planning Board must submit a recommendation to the District Council, after which the District Council may approve or disapprove the requested amendment. A decision to change the underlying zone and list of allowed uses for a property is, in substance, a decision to approve a zoning map amendment. The decision, therefore, falls within the District Council's authority under the RDA to approve zoning map amendments.

**LAND USE – PIECEMEAL REZONING DECISIONS**

Generally, piecemeal rezoning of a property from one Euclidean zone to another may be granted only upon a showing of either a mistake in the prior original or comprehensive zoning or a substantial change in the character of the neighborhood since the time of the original or comprehensive zoning. As an exception, no such showing of a change or mistake is required to grant an application for a floating zone. To rezone a property to a floating zone, the local zoning body must find that the legislative prerequisites for the zone are satisfied and that the rezoning is compatible with the surrounding neighborhood.

Section 27-548.26(b) of the Prince George's County Code authorizes changes to the underlying zone or list of allowed uses for properties located in the development district overlay zone. This provision requires no showing of a change or mistake. To approve an application, the District Council must "find that the proposed development conforms with the purposes and recommendations for the Development District, . . . meets applicable site plan requirements, and does not otherwise substantially impair the implementation of any comprehensive plan applicable to the subject development proposal." *Id.* § 27-548.26(b)(5). This legislatively-established process for making certain zoning changes is sufficiently analogous to the process of applying for a floating zone that it is an appropriate exercise of the District Council's zoning powers. No showing of change or mistake is required in this context.

**LAND USE – DENSITY REGULATIONS**

Under the Prince George's County Code, "Development District Standards" in the development district overlay zone may modify density regulations of the underlying zone. PGCC § 27-548.23(b) provides: "Development District Standards may not permit density in excess of the maximum permitted in the underlying zone." Throughout the zoning ordinance, density means the number of dwelling units per net acre of net lot or tract area. Net lot area means the total area of the property, excluding: alleys, streets, and other public ways; and land lying within the 100-year floodplain.

In this case, the District Council added townhouses to the list of allowed uses for a property in the development district overlay zone. In the underlying zone, the maximum density for one-family detached residences is 6.7 dwelling units per net acre. The zoning ordinance provides no maximum density for townhouses in the underlying zone. The District Council erred in approving a density of 6.7 dwelling units "per acre" for one-family detached residences, because that density exceeds the maximum of 6.7 dwelling units per net acre of net lot or tract area. The District Council also erred in approving a density of 9.0 dwelling units "per acre" for townhouses. Although the District Council could establish a density for townhouses that is different from the density for one-family detached residences, the District Council must express that density as a number of dwelling units per net acre of net lot or tract area.

Circuit Court for Prince George's County
Case Nos. CAL1921492 & CAL1922819

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 1261

September Term, 2020

———————————————————————

CITY OF HYATTSVILLE, ET AL

v.

PRINCE GEORGE'S COUNTY COUNCIL,
ET AL.

———————————————————————

Kehoe,
Arthur,
Wells,

JJ.

———————————————————————

Opinion by Arthur, J.

———————————————————————

Filed: February 23, 2022

\* Leahy, J., did not participate in the Court's
decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal concerns a decision by the Prince George's County Council, sitting as the District Council, to approve zoning changes for a property located within the City of Hyattsville. The District Council rezoned part of the property from the "Open Space" zone to the "One-Family Detached Residential" zone and amended the list of allowed uses to permit townhouses to be constructed on the property. After the City of Hyattsville and several Hyattsville residents petitioned for judicial review, the Circuit Court for Prince George's County affirmed the District Council's decision.

For the reasons set forth in this opinion, we shall uphold the District Council's decision to change the zoning of the property and to amend the list of allowed uses, but we shall direct that this case be remanded to the District Council to reconsider its decision regarding the density of development permitted on the property.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Subject Property

This case concerns a property located within the City of Hyattsville in Prince George's County. The property includes two parcels separated by a city street, 40th Place. The upper parcel is approximately 3.6 acres in size, and the lower parcel is approximately 4.66 acres in size.

The upper parcel formerly served as the site of the headquarters building for the Washington Suburban Sanitary Commission (WSSC). The building has been vacant since the mid-1990s. A parking lot for the former WSSC headquarters is located on the lower parcel. A significant percentage of the lower parcel lies within the County's 100-

year floodplain.[1]

Adjoining properties to the north of the subject property are developed with single-family detached houses.  Three multi-family apartment buildings sit on the adjoining properties located to the south of the upper parcel and to the east of the lower parcel.  A public park known as Magruder Park sits on the adjoining properties located to the south and west of the subject property.[2]

### B.　2004 Sector Plan and Sectional Map Amendment

In September 2004, the Prince George's County Planning Board adopted a sector plan for the "Gateway Arts District," which covers the City of Hyattsville and three other municipalities.  To implement the sector plan, the Planning Board endorsed a sectional map amendment, which included comprehensive rezoning of the Gateway Arts District. The Prince George's County Council, sitting as the District Council, approved the sector plan and sectional map amendment in November 2004.

The sector plan "provides comprehensive guidance for future development" in the Gateway Arts District.  2004 Approved Sector Plan and Sectional Map Amendment for

---

[1] The Prince George's County zoning ordinance defines the "One Hundred (100) Year Floodplain" as "[t]hat area of land which would be covered by a flood that has a one percent (1%) chance of being equalled or exceeded in any year[.]"  Prince George's County Code ("PGCC") § 27-107.01(a)(90).  The 100-year floodplain is "delineated on a County comprehensive watershed management study approved by the County Stormwater Management Task Force."  PGCC § 27-124.01.

[2] An overhead image of the property is included in Appendix A to this opinion.

2

the Prince George's County Gateway Arts District, at v.[3]  The sector plan describes seven

"character areas," each with distinct characteristics.  *Id.* at 17.  Each character area has its

own set of "Development District Standards," which "implement the concepts and

recommendations" for each character area.  *Id.* at 135.  The sector plan assigned the

subject property to the "traditional residential neighborhood" or "TRN" character area,

which is reserved primarily for single-family housing.  *See id.* at 138.

The 2004 sectional map amendment imposed an overlay zone known as the

Development District Overlay (D-D-O) zone over the entire Gateway Arts District.  "The

D-D-O Zone is a mapped zone which is superimposed by a Sectional Map Amendment

(SMA) over other zones in a designated development district, and may modify

development requirements within the underlying zones."  Prince George's County Code

("PGCC") § 27-548.19.  New development on properties in the D-D-O zone generally

requires approval of a detailed site plan by the County Planning Board, which reviews the

detailed site plan for its compliance with the applicable development standards.  *Id.*

In addition to establishing an overlay zone, the sectional map amendment changed

the underlying zones for various properties.  Before the rezoning, both parcels of the

subject property were assigned to the "R-55" or "One-Family Detached Residential"

zone.  *See* PGCC § 27-430.  The sectional map amendment left the upper parcel in the R-

55 zone, but changed the lower parcel to the "O-S" or "Open Space" zone.  The O-S

zone, whose purposes include the conservation of natural resources, permits development

_____

[3] This document is available online at: https://www.mncppcapps.org/planning/
publications/BookDetail.cfm?item_id=23&Category_id=1.

at a lower density relative to other residential zones.  PGCC § 27-542(a).  The sectional

map amendment gave the following explanation for this change: "Rezoning to O-S

creates the opportunity to expand parkland and reinforce the vision of the traditional

residential neighborhood character area."  2004 Approved Sector Plan and Sectional Map

Amendment, at 123.

### C.    Werrlein's Applications for Rezoning of the Property

Long after the 2004 rezoning, a development company known as Werrlein WSSC,

LLC, purchased the subject property.  Werrlein intended to remove the former WSSC

headquarters building and parking lot and to construct a combination of one-family

detached residences and attached residences (i.e., townhouses) on the property.

The existing zoning classifications for the property did not permit townhouses.  In

the traditional residential neighborhood character area of the D-D-O zone, townhouses

are permitted if that use is allowed in the property's underlying zone.  2004 Approved

Sector Plan and Sectional Map Amendment, at 196.  Under the County zoning ordinance,

townhouses are not permitted in the R-55 zone, except under certain narrow

circumstances.  *See* PGCC § 27-441(b).  One-family detached dwellings are permitted in

the R-55 zone (*id.*), with a maximum density for 6.7 dwelling units per net acre of net lot

or tract area.  PGCC § 27-442(h).  One-family detached dwellings are permitted in the O-

S zone (PGCC § 27-441(b)), with a maximum density of 0.2 dwelling units per net acre

of net lot area or tract area.  PGCC § 27-442(h).  Townhouses generally are not permitted

in the O-S zone.  PGCC § 27-441(b).

On March 29, 2018, Werrlein submitted an application to the Planning Board

4

under PGCC § 27-548.26(b).  That provision states, in relevant part, that an owner of property located in the approved D-D-O zone "may request changes to the underlying zones or the list of allowed uses, as modified by the Development District Standards." PGCC § 27-548.26(b)(1)(B).  In the application, Werrlein asked to "amend the Table of Uses . . . to allow single-family attached/detached dwellings in the [traditional residential neighborhood] area for this site."  The application included a conceptual site plan depicting the proposed development.  Initially, Werrlein proposed to develop the property with 16 detached dwelling units and 66 attached dwelling units (i.e., townhouses), for a total of 82 dwelling units.  The upper parcel would have both detached houses and townhouses, while the lower parcel would have townhouses only.[4]

Werrlein subsequently submitted two amended applications.  In the first amended application, Werrlein asked to change the zoning of the lower parcel to either the R-55 zone or the R-10A Zone, which permits "high-density multifamily residential development[.]"  PGCC § 27-438(a)(1)(a).  The second amended application asked to rezone both parcels to the "M-U-I" or "Mixed Use – Infill" zone, which permits "a mix of residential and commercial uses as infill development in areas which are already substantially developed."  PGCC § 27-546.15(a).

After a series of votes by its City Council, the City of Hyattsville notified the Planning Board that the City did not support Werrlein's requests for rezoning of the property.  Separately, however, the City reached an agreement with Werrlein to purchase

---

[4] An illustration of the development proposal is included in Appendix B to this opinion.

5

1.81 acres of the lower parcel, which the City intended to use to expand Magruder Park. Settlement of the purchase agreement was contingent on Werrlein obtaining a zoning amendment. The agreement stated that no part of it should be construed as an endorsement, by the City, of Werrlein's requests for a zoning amendment.

### D.    Initial Recommendation by the Planning Board

The Prince George's County zoning ordinance sets forth a multi-step process after a property owner applies for certain zoning changes in the approved development district overlay zone. First, the Planning Board's technical staff must review the application and submit a written report. PGCC § 27-548.26(b)(3). Next, the Planning Board must hold a public hearing and submit a recommendation to the District Council. *Id.* Ultimately, the District Council may approve, conditionally approve, or disapprove the requested zoning changes. PGCC § 27-548.26(b)(5).

After Werrlein submitted the second amended application, the Planning Board's technical staff reviewed the application and issued a written report. The technical staff advised the Board not to endorse Werrlein's request to rezone the property to the M-U-I zone, concluding that the M-U-I zone was not appropriate for the traditional residential neighborhood character area of the D-D-O zone. The report advised the Board, however, to recommend rezoning the lower parcel from the O-S zone to the R-55 zone and allowing "single-family attached residential development" (i.e., townhouses) on the property.

The staff report observed that, under PGCC § 27-548.23(b), Development District Standards in the D-D-O zone "may not permit density in excess of the maximum

6

permitted in the underlying zone." For that reason, the report concluded that "the single-family dwellings be developed consistent with the maximum allowed density of 6.7 dwelling units per gross acre in the R-55 Zone[.]"[5] The report recommended that "the single-family attached dwellings, which do not have a density limitation in the R-55 Zone because they are not generally permitted, be allowed at nine dwelling units per gross acre."

The staff report noted that, because of a special exemption included in the 2004 enactment creating the D-D-O zone, "R-55 zoned properties in the [traditional residential neighborhood] character area, within the City of Hyattsville" ordinarily are exempt from D-D-O development standards. The report advised the Board that, to ensure that the new development would be compatible with the existing development on the adjoining properties, the entire property should be subject to all development standards for the traditional residential neighborhood character area of the D-D-O zone.

On July 26, 2018, the Planning Board held a public hearing to consider Werrlein's application. During the hearing, a representative of the City of Hyattsville and several residents from the neighborhood surrounding the property voiced their opposition to the application, while some residents expressed support for the application. The Planning Board voted to adopt the staff report's recommendations for rezoning the property. The Planning Board adopted a resolution recommending that the District Council disapprove

---

[5] In fact, the maximum density for one-family detached dwellings in the R-55 zone is 6.7 dwelling units per *net acre* of net lot or tract area. PGCC § 27-442(h). Net lot area is the total contiguous area of a lot, excluding: alleys, streets, and other public ways; and land lying within the 100-year floodplain. PGCC § 27-107.01(a)(161).

the request to rezone the property to the M-U-I zone and approve rezoning the lower parcel to the R-55 zone.

In its resolution, the Planning Board recommended that the District Council "permit single-family attached residential development, in accordance with the goals and recommendations of the Traditional Residential Neighborhood Character Area on the property." The resolution stated: "The maximum density for single-family attached is 9 dwelling units per acre and the maximum density for single-family detached is as permitted in the R-55 zone, or 6.7 dwelling units per acre." Finally, the Planning Board recommended approval of the conceptual site plan, subject to certain conditions. Among other things, the resolution stated that, prior to the issuance of any building permit, Werrlein would be required to "obtain approval of a detailed site plan (DSP) of the entire site[,]" at which point the property would "be subject to all Development District Overlay (D-D-O) Zone standards applicable to the Traditional Residential Neighborhood Character area."

### E.    Appeal to the District Council and Remand to the Planning Board

Sarah Eisen, along with several other Hyattsville residents, took an appeal of the Planning Board's decision, urging the District Council to reject the application. Among their various objections, the Eisen parties asserted that the Planning Board had "failed to provide a legally sufficient basis" for "allowing townhouses in the R-55 zone" or for "allowing residential density that exceeds what is allowed in the R-55 zone." The Eisen parties further argued that, because Werrlein's second amended application had asked to rezone the property to the M-U-I zone, the District Council lacked the authority to rezone

8

the property to the R-55 zone.

In addition, the Eisen parties asserted that the Planning Board had failed to comply with PGCC § 27-125.05(a), which requires the Planning Board to publish the technical staff report on its website at least two weeks before the public hearing in any zoning or site plan case. As the Eisen parties observed, the Planning Board had published the staff report on its website just seven days before the hearing.

In a letter to the District Council, the City of Hyattsville expressed its "opposition to the process utilized in reviewing" the application. The City observed that the Planning Board ultimately recommended a zone different from the one requested in the application. In light of that change, as well as the delay in publishing the staff report, the City argued that it had not "receive[d] adequate notice of the proposed zoning change."

After a hearing at which it heard oral argument from the parties of record, the District Council issued an order remanding the matter to the Planning Board for a limited review of specific issues before the District Council's final decision on the merits of the application. The District Council relied on PGCC § 27-548.26(b)(3), which provides: "Before final action, the District Council may remand the application to the Planning Board for review of specific issues."

In its remand order, the District Council rejected various challenges made by the Eisen parties. The District Council reasoned that, even though Werrlein had requested rezoning both parcels to the M-U-I zone, "the Planning Board was authorized to recommend a zone different from what the applicant requested." The District Council determined, however, that the Planning Board had failed to publish a copy of the

9

technical staff report on its website at least two weeks before the hearing, as required by PGCC § 27-102.05(a). For that reason, the District Council directed the Planning Board to schedule a new hearing and "to allow the applicant and opposition adequate time to present evidence for and against the application."

As part of the remand, the District Council directed the Planning Board to "provide supplemental analysis" for the recommendation to rezone the property to the R-55 zone. The District Council directed the Planning Board to "focus" on the criteria stated in PGCC § 27-548.26(b)(1)(B)(ii) for approving requests to amend Development District Standards for properties in the D-D-O zone. The District Council further directed the Planning Board to "provide supplemental analysis and explanation of the maximum density per acre for single-family attached and single-family detached dwelling units for the R-55 Zone recommendation."

After the remand, the Planning Board received a supplemental memorandum from its technical staff and scheduled a new hearing. One of the five commissioners was absent from the hearing. At the conclusion of testimony and arguments, one commissioner moved to adopt the analysis of the staff memorandum and to recommend that the District Council again approve the application. The motion failed, by a tie vote, with two commissioners in support of the motion and two opposed. No additional motions were made.

The Planning Board issued an amended resolution stating that, because the motion for approval had failed, the Board would forward the application "to the District Council for final decision, without a recommendation supporting any rezoning of the property."

10

The amended resolution stated that the Board was making "NO RECOMMENDATION" on the request for rezoning of the property.

### F.      Final Decision of the District Council

At a public hearing on May 13, 2019, the District Council voted to approve the rezoning of the lower parcel and to allow townhouses on the subject property. The District Council directed its staff to prepare an order conditionally approving Werrlein's application. On June 10, 2019, the District Council issued its final decision approving the conceptual site plan and the "request to change the underlying zone of a portion of the subject property from Open-Space (O-S) to R-55 (One-Family Detached Residential) and the list of allowed uses in the Development District, to facilitate R-55 development of the entire 8.26 acres[.]"

The District Council concluded that rezoning the lower parcel to the R-55 zone would advance the purposes and recommendations of the traditional residential neighborhood character area, as set forth in the sector plan. The District Council emphasized that the "[t]estimony was overwhelming and persuasive that the abandoned WSSC building and vacant parking lot on the property are an 'eyesore'" and "are not compatible with the surrounding residential neighborhood." "In stark contrast to the abandoned WSSC headquarters and parking lot," the District Council wrote, "the Conceptual Site Plan demonstrates that the subject property will be compatible with the surrounding residential neighborhood when a portion of the property is rezoned to R-55, to facilitate R-55 development of the entire 8.26[ ]acres with single-family attached townhomes and detached single-family homes."

11

In its written decision, the District Council endorsed the proposed densities of "9 dwelling units per acre . . . for single-family attached units and 6.7 dwelling units per acre (as permitted in R-55) for single-family detached units[.]" The District Council stated that allowing those proposed densities would "benefit the proposed development," would "further the purposes of the Development District," and would "not substantially impair the implementation" of the 2004 sector plan or the applicable master plan. The District Council also stated that the proposed development would "enable density transition from the higher multi-family zone" on one side of the property and "the lower single-family zone" on the other side. A footnote stated that Werrlein was "propos[ing]" the development of 31 dwelling units on the upper parcel and 41 units on the lower parcel, for a total of 72 units on the 8.26-acre property.

Overall, the District Council concluded that changing the underlying zone of the lower parcel and the list of allowed uses for the property would "benefit the proposed development," would "further the purposes of the Development District," and would "not substantially impair the implementation of" the 2004 sector plan or any other applicable comprehensive plan.

### G.    Petitions for Judicial Review

The City of Hyattsville petitioned for judicial review of the District Council's decision in the Circuit Court for Prince George's County. The Eisen parties filed a separate petition for judicial review. The circuit court later consolidated the two petitions. Werrlein and the District Council each opposed the two petitions.

In the circuit court, the City of Hyattsville argued that, under *County Council of*

12

*Prince George's County v. Zimmer Development Co.*, 444 Md. 490 (2015), the Planning Board (rather than the District Council) had exclusive jurisdiction to decide whether to approve or disapprove Werrlein's application. The City further argued that the Planning Board's tie vote after the remand operated as an outright denial of the application. The City contended, therefore, that the District Council lacked the authority to make its own independent decision to approve the application after the Planning Board failed to approve it.

In addition, the City contended that the decision to change the zoning classification of the lower parcel contravened Maryland's "change-mistake" rule. *See generally Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 538-39 (2002). The City argued that this rule prohibited the rezoning of the lower parcel, absent a showing of unforeseen and significant changes in the surrounding neighborhood since the prior comprehensive rezoning or a mistake of fact made in the previous comprehensive rezoning. The City argued that, because Werrlein had made no such showing of either a "change" or a "mistake," the application should have been denied.

For their part, the Eisen parties purported to rely on a footnote within the enactment creating the D-D-O zone for the Gateway Arts District, which states: "R-55 zoned properties in the [traditional residential neighborhood] character area within the incorporated City of Hyattsville are exempt from the development standards and will abide by the requirements of the R-55 Zone." 2004 Approved Sector Plan and Sectional Map Amendment, at 144. The Eisen parties contended that this exemption precluded the District Council from changing the allowed uses or density regulations for the subject

13

property.

The Eisen parties further contended that, as approved by the District Council, the density of the development would exceed the maximum density permitted under the County zoning ordinance. The Eisen parties pointed out that, for properties in the D-D-O zone, density may not exceed the maximum density permitted in the underlying zone. *See* PGCC § 27-548.23(b). The Eisen parties observed that, in the R-55 zone, the maximum density for one-family detached dwellings is 6.7 dwelling units per net acre of net lot area. *See* PGCC § 27-442(h). The Eisen parties argued that the District Council exceeded these limits by approving densities of 6.7 detached dwelling units "per acre" (rather than net acre) and nine attached dwelling units "per acre."

On December 14, 2020, after a hearing, the circuit court issued an order affirming the decision of the District Council. In a memorandum opinion accompanying its order, the circuit court concluded that "[t]he final decision of the District Council, on rezoning, amendment of the use tables, and certain density of development on the property was supported by substantial evidence[,]" and "was not arbitrary or capricious or based on an erroneous interpretation or application of the law."

After the circuit court entered its order affirming the decision of the District Council, the City of Hyattsville and the Eisen parties each filed timely notices of appeal.

QUESTIONS PRESENTED

In their appeals, the City of Hyattsville and the Eisen parties ask this Court to reverse the District Council's decision and to direct the District Council to disapprove Werrlein's application. They present an array of challenges to different components of

14

the District Council's decision.

In its appellate brief, the City of Hyattsville asks: "Did the District Council err in its approval of [Werrlein's application]?" The City contends that the District Council lacked the authority to approve the application after the Planning Board failed to approve it by a majority vote. Separately, the City contends that the District Council erred by rezoning the lower parcel without making any finding of either a change in the character of the neighborhood or a mistake in the existing zoning classification. The City also contends that the decision to rezone the lower parcel to the R-55 zone should be reversed because, the City argues, that decision is "inconsistent" with the 2004 sector plan.

In their appellate brief, the Eisen parties ask: "Did the District Council's decision to authorize development of 72 dwelling units including Townhouses, at up to nine (9) units per gross acre, violate the Zoning Ordinance?" The Eisen parties contend that, even if the decision to rezone the lower parcel to R-55 should be upheld, the District Council lacked authority to change the list of allowed uses on the subject property to include townhouses. The Eisen parties further contend that the District Council erroneously approved densities for the subject property in excess of the maximum density permitted in the underlying zone.

The District Council and Werrlein each argue that the District Council's decision is supported by substantial evidence and not premised on any error of law and, consequently, should be affirmed.

### STANDARD OF REVIEW

"When acting in its zoning capacity, the District Council acts as an administrative

agency." *Grant v. County Council of Prince George's County*, 465 Md. 496, 503 (2019) (citing *County Council of Prince George's County v. Brandywine Enters., Inc.*, 350 Md. 339, 342 (1998)). By statute, an aggrieved party may petition for judicial review of a final decision of the District Council, including an individual map amendment. Md. Code (2012, 2020 Supp.), § 22-407(a) of the Land Use Article ("LU"). In the judicial review action, the circuit court may:

> (1) affirm the decision of the district council;
>
> (2) remand the case for further proceedings; or
>
> (3) reverse or modify the decision if the substantial rights of the petitioner have been prejudiced because the district council's action is:
>
>> (i) unconstitutional;
>>
>> (ii) in excess of the statutory authority or jurisdiction of the district council;
>>
>> (iii) made on unlawful procedure;
>>
>> (iv) affected by other error of law;
>>
>> (v) unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
>>
>> (vi) arbitrary or capricious.

LU § 22-407(e).

In an appeal from the circuit court's judgment, this Court's "role is to repeat the task of the circuit court, i.e., to determine whether the circuit court's review was correct." *Colao v. County Council of Prince George's County*, 109 Md. App. 431, 458 (1996) (citing *Cox v. Prince George's County*, 86 Md. App. 179, 187 (1991)). Accordingly, this

16

Court evaluates the agency's decision using the same standards used by the circuit court. *See Grant v. County Council of Prince George's County*, 465 Md. at 509 (citing *People's Counsel for Baltimore County v. Loyola Coll. in Md.*, 406 Md. 54, 66 (2008)).

"Judicial review of the final zoning action of a local administrative body . . . 'is narrow; it is limited [usually] to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determin[ing] if the administrative decision is premised upon an erroneous conclusion of law.'" *Montgomery County v. Butler*, 417 Md. 271, 283 (2010) (quoting *Marzullo v. Kahl*, 366 Md. 158, 171 (2001)). An appellate court may reverse the decision of a local zoning body "'where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute.'" *Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. 53, 78 (2008) (quoting *People's Counsel of Baltimore County v. Surina*, 400 Md. 662, 682 (2007)). Appellate courts "review legal questions or the agency's conclusions of law de novo." *Grant v. County Council of Prince George's County*, 465 Md. at 509 (citing *Koste v. Town of Oxford*, 431 Md. 14, 25 (2013)).

"The scope of judicial review of administrative fact-finding is a narrow and highly deferential one." *Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. at 78 (citing *People's Counsel for Baltimore County v. Loyola Coll. in Md.*, 406 Md. at 66). "'[I]n zoning matters, the zoning agency is considered to be the expert in the assessment of the evidence, not the court.'" *Cremins v.*

*County Comm'rs of Washington County*, 164 Md. App. 426, 437 (2005) (quoting *Bowman Group v. Moser*, 112 Md. App. 694, 699 (1996)). "[P]iecemeal rezoning" decisions, such as the one made by the District Council in this case, are "reviewed most frequently under the substantial evidence test." *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 510 (2015).

"A conclusion by a local zoning board satisfies the substantial evidence test if 'a reasonable mind might accept as adequate' the evidence supporting it." *Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. at 78 (quoting *People's Counsel for Baltimore County v. Loyola Coll. in Md.*, 406 Md. at 67). In other words, "[t]he determination of the zoning authority should be upheld 'if reasoning minds could reasonably reach the conclusion from facts in the record.'" *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. at 510 (quoting *Cremins v. County Comm'rs of Washington County*, 164 Md. App. at 438). If substantial evidence supports the conclusion of the zoning agency, the courts may not disturb that conclusion, "'even if substantial evidence to the contrary exists.'" *Cremins v. County Comm'rs of Washington County*, 164 Md. App. at 438 (quoting *White v. Spring*, 109 Md. App. 692, 699 (1996)).

In sum, unless the zoning decision is premised on an error of law, the court's proper role "'is not to substitute [its] assessment of the facts for those of the [local zoning agency] . . ., but merely to evaluate whether the evidence before the [agency] was "fairly debatable[.]"'" *Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. at 77 (quoting *Pemberton v. Montgomery County*, 275 Md.

18

363, 367-68 (1975)).

## I. Nature of District Council's Jurisdiction

The City of Hyattsville contends that the District Council lacked the authority to decide whether to approve Werrlein's application after the Planning Board failed to approve it. In this regard, the City advances two overlapping arguments.

First, the City argues that the District Council should have treated the Planning Board's action after the remand as a decision to disapprove Werrlein's application. As recounted previously, the Planning Board initially recommended that the District Council conditionally approve the application. The District Council remanded the matter to the Planning Board and directed the Board to provide supplemental analysis regarding its recommendations. During the remand hearing, the Planning Board reached a tie vote on a motion to recommend approval of the application. The Planning Board issued an amended resolution stating that it was making "no recommendation" on whether to approve or disapprove the request for a zoning amendment. The District Council then proceeded to make its final decision, in which it conditionally approved the application.

In its appellate brief, the City of Hyattsville asserts that the District Council "erroneously interpreted the Planning Board's tie vote" after the remand. The City observes that the Planning Board has adopted its own internal rules of procedure, which are supplemented by Robert's Rules of Order. The City asserts that, according to Robert's Rules of Order, a tie vote on a motion requiring majority assent operates as a denial of the motion. The City concludes that the District Council, in its final written decision, "mischaracterized the result of the Planning Board's tie vote as a 'no

19

recommendation.'"[6]

The City further contends that, under the division of authority established by the enabling statute, the Planning Board had exclusive jurisdiction to approve or disapprove the application, while the District Council was limited to exercising appellate jurisdiction over the Planning Board's decision. The City argues, therefore, that the District Council could properly reverse the Planning Board's decision only if that decision was unsupported by substantial evidence, arbitrary, capricious, or otherwise illegal. The City concludes that, because the District Council did not use that limited standard of review, the District Council's decision must be reversed.

In response, the District Council and Werrlein argue that the City's argument rests on an erroneous interpretation of the respective roles of the Planning Board and the District Council. The District Council and Werrlein contend that, in deciding whether to approve an application for rezoning under PGCC § 27-548.26(b), the District Council exercises original jurisdiction, while the Planning Board makes a mere recommendation. Therefore, according to Werrlein, regardless of whether the Planning Board's action operates as a decision to make no recommendation or a decision to recommend denial of the application, the District Council "ha[d] the authority to make the final decision as to

_____

[6] As the District Council points out in its brief, the Planning Board provided its own characterization of its own action. After discussing the implications of the tie vote on the record, the Planning Board issued a 24-page amended resolution stating that it was making "NO RECOMMENDATION" regarding the request for rezoning of the property. The District Council did not "mischaracterize[]" the Planning Board's decision by accurately reciting the Planning Board's official account of its own action. The error, if any, in determining the effect of the Planning Board's tie vote occurred in the Planning Board's proceedings, not those of the District Council.

20

rezoning and amending the table of uses."[7]

For the reasons explained below, we conclude that the District Council had original jurisdiction to decide whether to approve or disapprove the request to change the zoning of the lower parcel and to amend the list of allowed uses for the property. Thus, even if the Planning Board's action after the remand should be treated as a recommendation to deny the application, the District Council was statutorily authorized to make its own independent decision on the merits of the application. The Planning Board's tie vote in no way limited the District Council's plenary authority to grant the requested zoning changes for the subject property.

### A.    <u>Division of Authority under the Regional District Act</u>

"Under Maryland's constitutional scheme, a local government's authority to regulate land use may emanate only from enabling legislation of the General Assembly." *County Council of Prince George's County v. Zimmer Dev. Co.* ("*Zimmer*"), 444 Md. 490, 504 (2015) (citing Md. Const. Art. XI). The property at issue in this case is located in the portion of Prince George's County governed by the Maryland-Washington

---

[7] During its second hearing, the District Council considered analysis from a staff member regarding the effect of the Planning Board's tie vote. The staff member remarked that, "under Robert's Rules of Order, . . . a two-two tie is effectively a denial[,]" because it "essentially means that there was not enough support for approval." The staff member stated that the Planning Board's action after remand was "effectively . . . a denial of the request for the R-55 zone." The staff member opined that, in any event, the exact nature of the Planning Board's action was inconsequential because the Planning Board "has no authority or jurisdiction" to rezone a property or to change the list of allowed uses. Given these comments, it seems likely that the District Council proceeded on the premise that, regardless of how one should construe the Planning Board's action after the remand, the District Council was still the primary and final decision-maker regarding the merits of the application.

Regional District Act (RDA), codified at Division II of the Land Use Article of the Maryland Code. The RDA "regulates planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties." *Zimmer*, 444 Md. at 525. The RDA is "the exclusive source of zoning authority in those areas of Prince George's County which it covers." *County Council of Prince George's County v. Brandywine Enters., Inc.*, 350 Md. 339, 342 (1998).

The RDA "divides broadly authority related to zoning, planning, and other land use matters between the county (district) councils, the Maryland-National Capital Park & Planning Commission, and the county planning boards." *Zimmer*, 444 Md. at 525-26. The county councils for Prince George's County and Montgomery County, consisting of elected council members, are the legislative branches of their respective local governments. *See* Prince George's County Charter, Art. III, § 301; Montgomery County Charter, Art. I, § 101. The county councils serve as district councils for the portion of the regional district located in their respective counties. Md. Code (2012, 2020 Supp.), § 22-101 of the Land Use Article ("LU").

The Maryland-National Capital Park & Planning Commission consists of five commissioners from Prince George's County and five commissioners from Montgomery County. LU § 15-102(a)(1)-(2). The Montgomery County Council appoints each commissioner from Montgomery County, while the Prince George's County Executive appoints each commissioner from Prince George's County. LU § 15-102(a)(3). The five commissioners from each county serve as the planning boards for their respective

counties. LU § 20-201.[8]

The RDA grants "wide-ranging authority to the District Council to regulate zoning within the County." *Grant v. County Council of Prince George's County*, 465 Md. 496, 540 (2019). The RDA empowers the District Council to "divide the portion of the regional district located within its county into districts and zones of any number, shape, or area it may determine." LU § 22-201(a). The RDA authorizes the District Council "by local law" to "adopt and amend the text of the zoning law" for the County and to "adopt and amend any map accompanying the text of the zoning law" for the County. LU § 22-104(a)(1)-(2). By local zoning ordinance, the District Council may regulate matters such as "the density and distribution of the population" (LU § 22-104(b)(4)), "the location and uses of buildings and structures" for residential and other purposes (LU § 22-104(b)(5)), and "the uses of land" for those purposes (LU § 22-104(b)(6)).[9]

---

[8] Multiple provisions of the RDA "seek[] to foster a degree of independence in and immunize, to some extent, the Commission from undue grass roots and hierarchical political influence." *Zimmer*, 444 Md. at 527. The RDA states that commissioners must be persons "of ability, experience, and integrity" (LU § 15-102(b)), and "may not be selected as representing or supporting any special interest." LU § 15-102(c)(2). No more than three of the five commissioners from each county may be members of the same political party. LU § 15-102(c)(1). The RDA also includes broad disclosure requirements and other restrictions regarding potential conflicts of interest for commissioners. *See* LU § 15-120. These provisions reflect "an intent of the State Legislature to prevent corruption of or the appearance of impropriety by the commissioners." *Zimmer*, 444 Md. at 528. In short, the Commission and planning boards are designed to be "relatively apolitical" in nature. *Id.* at 527 n.34.

[9] Furthermore, "[i]n approving any zoning map amendment," the Prince George's County District Council "may consider and adopt any reasonable requirements, safeguards, and conditions that: (1) may be necessary to protect surrounding properties from adverse effects that might accrue from the zoning map amendment; or (2) would further enhance the coordinated, harmonious, and systematic development of the regional

Under the RDA, the county planning boards are "responsible for planning, subdivision, and zoning functions that are primarily local in scope[.]" LU § 20-202(a)(1)(i). Except for "regional planning functions of the Commission related to or affecting the regional district as a planning unit" (LU § 20-202(a)(2)), the RDA authorizes a county planning board to "exercise, within the county planning board's jurisdiction, the following powers: 1. planning; 2. zoning; 3. subdivision; 4. assignment of street names and house numbers; and 5. any related matter." LU § 20-202(a)(1)(ii).

The RDA further provides:

(b)(1) A county planning board has exclusive jurisdiction over:

    (i) local functions, including:

        1. the administration of subdivision regulations;

        2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments; and

        3. the assignment of street names and house numbers in the regional district[.]

LU § 20-202(b)(1).

In addition, the RDA specifies that "functions not specifically allocated" in the subtitle governing the county planning boards "shall be assigned to the Commission or to one or both of the county planning boards, as needed." LU § 20-207(a). These "assignments shall: (1) be made by resolution of the Commission with the approval of the respective county council; and (2) carry out the policy that local or intracounty planning

_____

district." LU § 22-214(a). The RDA includes no similar provision for Montgomery County.

24

functions should be performed by the county planning boards." LU § 20-207(b).

## B. *Zimmer*'s Interpretation of the Regional District Act

The Court of Appeals' opinion in *County Council of Prince George's County v. Zimmer Development Co.* ("*Zimmer*"), 444 Md. 490 (2015), written by Judge Glenn T. Harrell, Jr., provides a comprehensive overview of the land-use regime in Prince George's County. In that case, the Court partially invalidated provisions of the local zoning ordinance through which the District Council purported to grant itself "original jurisdiction" to decide whether to approve or disapprove comprehensive design plans and specific design plans for proposed development of a property. *Id.* at 570-71. The Court held that the review of those types of design plans was one of the unspecified "local functions" that the General Assembly had delegated to the original jurisdiction of the Planning Board, subject to appellate review by the District Council. *Id.* at 569-70.

The *Zimmer* case concerned a property in Prince George's County on which a developer wished to construct a small retail center. *Zimmer*, 444 Md. at 536. In 2004, the developer applied for a zoning map amendment, seeking to rezone the property from a "Rural Residential" zone to a floating zone known as the "Local Activity Zone," which would permit the use of the property for a retail center. *Id.* at 537. The application included "a Basic Plan depicting how [the developer] would develop the property generally[.]" *Id.* The County Council adopted an ordinance granting the requested rezoning, subject to numerous conditions. *Id.*

Several years later, in 2011, the developer requested the approval of a proposed comprehensive design plan and specific design plan, which were among the prerequisites

for beginning actual development. *Zimmer*, 444 Md. at 541. The Planning Board approved those design plans, subject to certain conditions. *Id.* The District Council elected to review the decision and remanded the matter for the Planning Board to consider specific areas of concern. *Id.* at 545. The Planning Board then issued amended resolutions, again conditionally approving the design plans. *Id.* at 546. The District Council again elected to review the decision (*id.* at 547) and voted to disapprove the proposed design plans. *Id.* at 549-50.

After the developer petitioned for judicial review, the circuit court reinstated the Planning Board's decision to approve the comprehensive design plan and specific design plan. *Zimmer*, 444 Md. at 550. The Court of Special Appeals affirmed the circuit court's judgment. *Id.* at 551. The reviewing courts concluded that the District Council was limited to exercising appellate jurisdiction over the proposed design plans, meaning that the District Council could reverse the Planning Board's decision only if that decision was arbitrary, capricious, discriminatory, or otherwise illegal. *Id.* (citing *County Council of Prince George's County v. Zimmer Dev. Co.*, 217 Md. App. 310, 318-31 (2014)).

In a subsequent appeal to the Court of Appeals, the District Council argued that comprehensive design plans and specific design plans were in "the nature of zoning map amendments[.]" *Zimmer*, 444 Md. at 554. The District Council argued, therefore, that the Planning Board's decision was merely a recommendation, which the District Council "had original authority to decide differently . . ., without any deference owed or presumptive correctness accorded the Planning Board's determination." *Id.* The Court of Appeals agreed that "Planning Board decisions in Prince George's County regarding

26

zoning map amendments are mere recommendations to the District Council[.]" *Id.* at 554-55. The Court concluded, however, that the design plan approvals in question "were not zoning map amendments, nor d[id] they partake of the character of such [amendments]." *Id.* at 555. The Court explained that the "act of rezoning" the property had been "completed in 2004 when the District Council approved the [Local Activity Center] zone and the Basic Plan for the proposed development[.]" *Id.* The subsequent process for review of the design plans was meant to ensure that the proposed development addressed the goals for the zone established by the earlier rezoning. *Id.*

The Court of Appeals held that, under the RDA, the county planning boards have original jurisdiction to decide whether to approve or deny comprehensive design plans and specific design plans. *Zimmer*, 444 Md. at 567-71. The Court explained that LU § 20-202(b) "provides that the county planning boards have 'exclusive jurisdiction' over 'local functions,' but does not detail each of these local functions within each jurisdiction." *Id.* at 567. "These functions," the Court explained, "may include any local matter related to planning, zoning, subdivision, or assignment of street names and house numbers[,]" as well as other "unlisted local functions" "delegated to the planning boards pursuant to LU § 20-207[.]" *Id.* at 567-69. The Court noted that the General Assembly "did not itemize expressly or exhaustively each such intended function[.]" *Id.* at 569.

The Court reasoned that the RDA "makes particular provision for the local functions that the Legislature did not intend to be within the planning board's exclusive jurisdiction." *Zimmer*, 444 Md. at 569. As an example, the Court pointed out that "LU § 22-208 requires referral to the county planning boards of applications for zoning map

27

amendments for a 'recommendation.'" *Id.* Because review of comprehensive design plans and specific design plans "were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction," the Court concluded that, "like other unspecified local planning functions, the Planning Board is invested with exclusive jurisdiction over the determination of [comprehensive design plans] and [specific design plans], subject to appellate review by the District Council." *Id.* at 569-70 (footnote omitted).

The Court reasoned that, because comprehensive design plans and specific design plans fall within the "exclusive jurisdiction" of the county planning boards, the Planning Board must be the primary decision-maker regarding the merits of such a design plan. *Zimmer*, 444 Md. at 570. The Court concluded that a provision of the County zoning ordinance purporting to grant the District Council original jurisdiction over those decisions "violate[d] the division of authority established by the RDA" and was therefore "invalid." *Id.*

The District Council could, however, properly exercise appellate jurisdiction over the Planning Board's decision to approve or disapprove a comprehensive design plan or specific design plan. *Zimmer*, 444 Md. at 572-73. Under that limited authority, the District Council could reverse the Planning board's decision only "if it is not authorized by law, is not supported by substantial evidence of record, or is arbitrary or capricious." *Id.* at 573. In other words, to ensure that the District Council does not "impinge on the original jurisdiction granted to the Planning Board" over comprehensive design plans and specific design plans, the District Council must employ the same "standard of review that

would be employed by the courts for the review of the same agency action[.]" *Id.* at 573.

In two subsequent opinions, this Court has applied *Zimmer* to determine whether a particular function is reserved to the original jurisdiction of the county planning boards. In *County Council of Prince George's County v. Convenience Dollar Market/Eagle Management Co.*, 238 Md. App. 613, 638-39 (2018), this Court held that the Planning Board has original jurisdiction to approve or deny a property owner's application for certification of a nonconforming use. In *County Council of Prince George's County v. FCW Justice, Inc.*, 238 Md. App. 641, 672 (2018), this Court held that the Planning Board has original jurisdiction over the review of a detailed site plan, when required as a condition of the approval of a subdivision application.

On both occasions, this Court explained that the analysis of *Zimmer* is "primarily one of statutory interpretation." *County Council of Prince George's County v. FCW Justice, Inc.*, 238 Md. App. at 668; *County Council of Prince George's County v. Convenience Dollar Market/Eagle Mgmt. Co.*, 238 Md. App. at 632. This Court emphasized that the critical issue in *Zimmer* was that the design plan approvals in question "'*were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction.*'" *County Council of Prince George's County v. FCW Justice, Inc.*, 238 Md. App. at 669 (quoting *Zimmer*, 444 Md. at 569); *County Council of Prince George's County v. Convenience Dollar Market/Eagle Mgmt. Co.*, 238 Md. App. at 633 (quoting *Zimmer*, 444 Md. at 569). Because the RDA included no such exception for the particular functions in question, this Court concluded that those functions fell within the original jurisdiction of the Planning Board, subject to appellate

29

jurisdiction of the District Council. *County Council of Prince George's County v. FCW Justice, Inc.*, 238 Md. App. at 672 (certification of a nonconforming use); *County Council of Prince George's County v. Convenience Dollar Market/Eagle Mgmt. Co.*, 238 Md. App. at 638-39 (review of a detailed site plan required as a condition of the approval of a subdivision application).

By contrast, in *Grant v. County Council of Prince George's County*, 465 Md. 496, 533-40 (2019), the Court of Appeals held that the District Council exercises original (rather than appellate) jurisdiction when it considers decisions to grant or deny special exceptions and variances heard by a zoning hearing examiner. The Court explained that the RDA grants the District Council "extensive authority to establish zoning law and procedures under which special exception and variance cases are held." *Id.* at 534. The Court cited LU § 22-301(a)-(b), which provides that the District Council may designate an administrative office or agency to grant special exceptions and variances and may establish procedures for appeals from those decisions. "Based on these grants of authority under the RDA," the Court explained, the District Council had enacted ordinances authorizing the zoning hearing examiner to hear special exception and variance cases, while specifying that the District Council exercises "original jurisdiction" in those cases. *Grant v. County Council of Prince George's County*, 465 Md. at 534. The Court concluded that the RDA included no statutory provision "which would limit the District Council's jurisdiction in zoning cases[,]" "a sphere that would encompass special exception and variance applications." *Id.* at 539.

30

## C.    Jurisdiction Over Rezoning Decisions Under PGCC § 27-548.26(b)

The present case arises from the District Council's decision to approve an application to change the underlying zone or list of allowed uses for a property in the development district overlay zone.

PGCC § 27-548.26(b)(1) states that "a property owner may request that the District Council amend development requirements for the owner's property[.]"  As relevant here, "[a]n owner of property in the Development District may request changes to the underlying zones or the list of allowed uses, as modified by the Development District Standards."  PGCC § 27-548.26(b)(1)(B).  The application must include: a statement showing that the proposed development conforms with the purposes and recommendations of the development district; a description of any requested amendments to the Development District Standards applicable to a qualifying development proposal; and either a detailed site plan or a conceptual site plan.  PGCC § 27-548.26(b)(2).

After the filing of an application, "Technical Staff shall review and submit a report on the application, and the Planning Board shall hold a public hearing and submit a recommendation to the District Council."  PGCC § 27-548.26(b)(3).  "Before final action the Council may remand the application to the Planning Board for review of specific issues."  *Id.*  Ultimately, "[t]he District Council may approve, approve with conditions, or disapprove any amendment requested by a property owner under this Section."  PGCC § 27-548.26(b)(5).[10]

---

[10] In its appellate brief, the City cites PGCC § 27-276, which sets forth general procedures for review of conceptual site plans.  As the City observes, PGCC § 27-

Without question, these provisions treat the District Council as the primary and final decision-maker on a request to change the underlying zone or allowed uses for a property in the development district.  The Planning Board's role is to "hold a public hearing and submit a recommendation to the District Council" (PGCC § 27-548.26(b)(3)), after which the District Council must decide whether to "approve, approve with conditions, or disapprove" the requested amendments.  PGCC § 27-548.26(b)(5).  Of course, the District Council "may not arrogate to itself original jurisdiction where the RDA places that responsibility elsewhere." *Zimmer*, 444 Md. at 570.  The remaining question, then, is whether this zoning ordinance violates the division of authority established by the RDA.

In our assessment, the review process for applications under PGCC § 27-548.26(b)(1)(B) is compatible with the RDA provisions that govern zoning map amendments.  LU § 22-206(a) expressly provides that "[a] district council may amend its zoning laws, including any maps: (1) in accordance with procedures established in its zoning laws; and (2) after holding an advertised public hearing."  The zoning laws established by a district council may include provisions for "hearings and preliminary determinations" by a board and procedures for "recommendations" by the county planning board.  LU § 22-206(b)(2)-(3).  The district council "may provide by local law

---

276(a)(5) states that "[t]he Planning Board shall approve, approve with modification, or disapprove the Conceptual Site Plan[.]"  The general site plan review procedures, however, do not prevail over the modified provisions for review of an application for zoning changes on a property in the D-D-O zone. *See* PGCC § 27-548.26(b)(3) (stating that "[f]iling and review of the application shall follow the site plan review procedures in Part 3, Division 9, except as modified in this Section").

procedures for the county planning board . . . to follow in considering zoning map amendments" as long as those procedures do not otherwise conflict with the RDA. LU § 22-208(b). Before approving any map amendment, the matter must be submitted to the county planning board "for a recommendation as to approval, disapproval, or approval with conditions." LU § 22-208(a). The county planning board "has exclusive jurisdiction over . . . the preparation and adoption of recommendations to the district council with respect to zoning map amendments[.]" LU § 20-202(b)(1)(i)(2).

Under these express provisions, decisions of whether to approve zoning map amendments are "among the local functions that the [General Assembly] [has] excepted from the planning boards' exclusive jurisdiction." *Zimmer*, 444 Md. at 569. The RDA places those decisions squarely within the authority of the District Council, while limiting the role of the Planning Board to making a recommendation regarding the District Council's decision. The required "referral to the Planning Board by the District Council of a pending piecemeal zoning map amendment is to receive advisory input only." *Id.* at 554 n.62. The District Council "decides whether to grant the amendment." *Id.* at 529 n.38 (citing LU § 22-206).

In this appeal, although the City of Hyattsville seeks the reversal of the District Council's decision to rezone the lower parcel, the City attempts to characterize that decision as nothing more than the approval of a conceptual site plan. Under the County zoning ordinance, site plans are "two dimensional, scaled drawing[s] which illustrate[] existing and proposed features of a piece of property." PGCC § 27-267(a). Conceptual site plans offer "a very general concept for developing a parcel of land" (PGCC § 27-

33

272(a)(1)) and serve to "illustrate approximate locations where buildings, parking lots, streets, green areas, and other similar physical features may be placed in the final design for the site[.]" PGCC § 27-272(c)(1)(B). Approval of a conceptual site plan, where required, is one of several sequential steps required before actual development may begin. *See* PGCC § 27-270(a) (establishing the following order of approvals: (1) zoning; (2) conceptual site plan; (3) preliminary plat of subdivision; (4) detailed site plan; (5) final plat of Subdivision; and (6) grading, building, use and occupancy permits).

The City notes that, in *Zimmer*, the Court of Appeals remarked that the comprehensive design plans at issue in that case share some significant similarities with conceptual site plans. *Zimmer*, 444 Md. at 559 n.69. The City argues that, like the design plan approvals addressed in *Zimmer*, conceptual site plan approvals are "not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction." *Id.* at 569. The City argues that, using the same reasoning here, the Planning Board has exclusive jurisdiction to decide whether to approve or disapprove conceptual site plans. The City urges us to conclude, therefore, that the Planning Board had exclusive jurisdiction to decide whether to approve or deny Werrlein's entire application.

If the decision under review involved nothing more than the approval of a conceptual site plan, then the City's argument might be persuasive. The target of the application here, however, was to obtain zoning changes. Werrlein's application requested a change to the zoning classification of the subject property under PGCC § 27-548.26(b)(1)(B). The District Council ultimately approved rezoning of part of the

property from O-S to R-55 and changing the list of allowed uses to permit townhouses. A decision to change the underlying zone and allowed uses for a particular property is, in substance, a decision to approve a zoning map amendment. The RDA grants the District Council the authority to make such a decision, after referral to the Planning Board for a recommendation. *See Zimmer*, 444 Md. at 554 & n.62.

It is true that Werrlein's application included a conceptual site plan. When an owner of property in the D-D-O zone requests a change to the underlying zone or list of allowed uses, the application must "include . . . [a] site plan," either a conceptual site plan or the detailed site plan that is required as a prerequisite for a building permit. PGCC § 27-548.26(b)(2)(C). The apparent purpose of this application requirement is to assist the District Council (and the Planning Board, in its advisory capacity) in evaluating whether a proposal meets the criteria for the requested zoning changes. PGCC § 27-548.26(b)(5) states that, when deciding whether to approve a requested amendment, the District Council must evaluate whether "the proposed development conforms with the purposes and recommendations for the Development District, . . . meets applicable site plan requirements, and does not otherwise substantially impair the implementation of any comprehensive plan applicable to the subject development proposal." Evaluating these criteria would be impracticable without at least some general concept of the proposed development, as provided by the site plan.

In this context, the site plan serves as one component in a larger process of deciding whether to approve requested zoning changes. Even though a conceptual site plan (or detailed site plan) is required as part of the application, the District Council's

35

decision to approve the application is, in substance, a decision to approve a zoning map amendment. That ultimate decision is one that, under the RDA, must be made by the District Council, not by the Planning Board. To conclude (as the City suggests) that the Planning Board has original jurisdiction to make such a rezoning decision would be to upend the process mandated by the RDA.[11]

In sum, the function performed here falls within the District Council's express statutory authority to approve zoning map amendments, after a referral to the Planning Board for advisory input. Accordingly, we reject the City's contention that the District Council "usurped the Planning Board's exclusive jurisdiction" when it made its own independent decision to approve zoning changes for the property.

## II.    Piecemeal Rezoning Without a Finding of Change or Mistake

In addition to arguing that the District Council lacked authority to rezone the lower parcel, the City of Hyattsville contends that the District Council applied an incorrect standard when it made its rezoning decision. The City argues that the District Council erred by changing the zoning classification of the lower parcel without finding either a substantial change in the surrounding neighborhood since the previous

---

[11] One might argue that, in this context, the decision to approve the conceptual site plan should be severed from the decision to approve zoning changes. In other words, one might argue that, even if the District Council exercises original jurisdiction over a request to change the underlying zone or list of allowed uses, the Planning Board has original jurisdiction to approve or disapprove the conceptual site plan associated with the application. The City of Hyattsville does not argue here that the rezoning decision should be severed from the site plan decision and that the site plan decision should be separately reviewed. Rather, the City challenges the District Council's rezoning decision, under the guise of a challenge to the approval of a conceptual site plan.

36

comprehensive rezoning or a mistake of fact in the previous comprehensive rezoning. Because this argument involves the interplay between multiple concepts of zoning law, additional exposition is necessary.

## A.     The Change-Mistake Rule and Departures from that Rule

In Maryland, the system commonly known as "Euclidean" zoning provides the "basic framework for implementation of land use controls at the local level." *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 511 (2015).[12] Under a Euclidean zoning scheme, "a municipality divides an area geographically into particular use districts, specifying certain uses for each district." *Rouse-Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County*, 138 Md. App. 589, 623 (2001). "'Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial,' and the 'zones appear on the municipality's official zoning map.'" *Id.* (quoting 1 Edward H. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 63.01, at 63-1-2 (4th ed. rev. 1994)). Restrictions within any district or zone must apply uniformly to all properties within that district or zone. *See* LU § 4-201(b)(2)(i); LU § 22-201(b)(2)(i).

Generally, "the act of zoning either may be original or comprehensive (covering a large area and ordinarily initiated by local government) or piecemeal (covering individual parcels, lots, or assemblages, and ordinarily initiated by the property owner)." *Mayor &*

---

[12] The term "Euclidean" refers to *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926), in which the United States Supreme Court upheld the constitutionality of a zoning ordinance that prohibited apartments and businesses in a residential district.

*Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 535 (2002). Original zoning and comprehensive rezoning "are purely legislative processes, while piecemeal rezoning is achieved, usually at the request of the property owner, through a quasi-judicial process leading to a legislative act." *Id.* at 532. "The motives or wisdom of the legislative body in adopting an original or comprehensive zoning enjoy a strong presumption of correctness and validity[.]" *Id.* at 535 (citing *Norbeck Vill. Joint Venture v. Montgomery County Council*, 254 Md. 59, 65-66 (1969)). In other words, Maryland law recognizes a presumption that the zones established through the legislative process "were well planned and arranged and were intended to be more or less permanent, subject to change only when there are genuine changes in conditions." *Offutt v. Board of Zoning Appeals of Baltimore County*, 204 Md. 551, 557 (1954).

The Court of Appeals has long held that piecemeal rezoning of a property from one Euclidean zone to another may be granted only "upon a showing that there was a mistake in the prior original or comprehensive zoning or evidence that there has been a substantial change in the character of the neighborhood since the time the original or comprehensive zoning was put in place." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 535-36. "This requirement, known as the 'change-mistake rule,'" serves to "prevent[] the arbitrary use" or the "abuse of the zoning power." *Id.* at 538. The Court of Appeals has explained:

> The "change-mistake" rule is a rule of the either /or type. The "change"
> half of the "change-mistake" rule requires that, in order for a piecemeal
> Euclidean zoning change to be approved, there must be a satisfactory
> showing that there has been significant and unanticipated change in a
> relatively well-defined area (the "neighborhood") surrounding the property

in question since its original or last comprehensive rezoning, whichever occurred most recently. The "mistake" option of the rule requires a showing that the underlying assumptions or premises relied upon by the legislative body during the immediately preceding original or comprehensive rezoning were incorrect. In other words, there must be a showing of a mistake of fact. Mistake in this context does not refer to a mistake in judgment. Additionally, even where evidence of a change or mistake is adduced, there is no reciprocal right to a change in zoning, nor is there a threshold evidentiary standard which when met compels rezoning. Even with very strong evidence of change or mistake, piecemeal zoning may be granted, but is not required to be granted, except where a failure to do so would deprive the owner of all economically viable use of the property. In Maryland, the change-mistake rule applies to all piecemeal zoning applications involving Euclidian zones, including those involving conditional zoning.

*Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 538-39 (collecting cases) (citations omitted).

In response to the relative rigidity of Euclidean zoning, "various mechanisms have been designed and incorporated into the planning and zoning process to allow for changes in the uses allowed within a given zone while at the same time retaining the safeguards of the requirement of uniformity within zones." *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 536-37. One such mechanism "is the 'special exception' or 'conditional use.'" *Id.* at 541. The legislative body, when it establishes the uses permitted in each zone, may identify additional uses that, although not permitted as a matter of right, will be allowed where an applicant meets certain standards of compatibility with neighboring properties. *Id.* at 541-42. The legislative body authorizes an administrative board to allow the enumerated uses based on a determination of "whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the

39

general purpose and intent" of applicable comprehensive plans. *Schultz v. Pritts*, 291 Md. 1, 11 (1981). "Because special exceptions are legislatively-created within the comprehensive zoning regulatory scheme, they enjoy the presumption of correctness[.]" *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 542. Accordingly, the applicant for a special exception need not make any showing of a change or mistake. *Id.* at 543.

In Maryland, "[d]issatisfaction with the relative inflexibility of Euclidian zoning" also "gave rise to the use of 'floating zones[,]'" which occupy "the far end of the flexibility continuum of zoning categories from Euclidean zones." *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 540 n.15. Under this device, "the local zoning authority establishes in its zoning ordinance a specific zoning classification for a specific purpose or a class of purposes, but does not assign on the zoning map the classification to any property[.]" *Zimmer*, 444 Md. at 515. This type of zone is said "to 'float' above the local jurisdiction to which the zone may be applied through the grant of piecemeal zoning map amendment[.]" *Id.* at 516.[13]

"Although the processing, review, and grant of a floating zone follows usually the same quasi-judicial process as Euclidian piecemeal rezonings, the change-mistake rule

---

[13] Generally, the Court of Appeals has described a floating zone as "a special detailed use district of undetermined location, a district in which the proposed kind, location, size and form of structures must be pre-approved, and which, like a special exception use, is legislatively predeemed compatible with the areas in which it may thereafter be located on a particular application, provided specified standards are gratified and actual incompatibility is not revealed." *Chatham Corp. v. Beltram*, 243 Md. 138, 149-50 (1966).

does not apply" to a floating zone application. *Zimmer*, 444 Md. at 516. "To rezone a property to a floating zone, the zoning authority must find generally that the legislative prerequisites for the zone are met and the rezoning is compatible with the surrounding neighborhood (much as required to grant a special exception)." *Id.* This showing "'replaces the usual proof of change or mistake[.]'" *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 540 n.15 (quoting *Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md. App. 607, 640 (1997)). While mechanisms such as special exceptions and floating zones "give increased flexibility to zoning regulatory schemes, protection against abuse is provided by the fact that the specific requirements and available alternatives for each mechanism must be spelled out in detail as a part of the comprehensive zoning ordinance, and thus cannot be 'made-up' out of convenience or expediency on a case-by-case basis." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 537-38.

**B.      Potential Applicability of the Change-Mistake Rule**

In the present appeal, the City of Hyattsville highlights the distinction between Euclidean zones and floating zones. The City asserts that, under Maryland law, a showing of either a change or mistake is required for piecemeal rezoning of a property, except when the zoning authority grants a floating zone. The City argues that, in this case, the District Council did not grant a floating zone. The City concludes, therefore, that the District Council could not change the zoning of the lower parcel absent a showing of either a change or mistake.

Elaborating on its argument, the City explains that the 2004 sectional map

amendment, an instance of comprehensive rezoning, established existing zoning classifications for the subject property, which are presumptively correct. The sectional map amendment left the upper parcel in the R-55 zone and placed the lower parcel in the O-S zone. The City observes that "the O-S and R-55 designations are undoubtedly Euclidian zoning designations." The City explains that, in the present case, the District Council "changed the underlying Euclidean zone of the lower parcel" from the O-S zone to the R-55 zone. According to the City, therefore, this change from one Euclidean zone to another required a showing of either a substantial change since the sectional map amendment or a mistake of fact made in the adoption of the sectional map amendment.

As the City acknowledges, the sectional map amendment did more than merely establish ordinary, Euclidean zones for both parcels. The sectional map amendment also imposed an overlay zone known as the development district overlay (D-D-O) zone over the subject property, as well as the rest of the Gateway Arts District. Generally, "the overlay zone concept has been described as 'a mapped . . . district superimposed on one or more established zoning districts[,]'" which "'may be used to impose supplemental restrictions on uses in these districts, permit uses otherwise disallowed, or implement some form of density bonus or incentive zoning program.'" *Cox v. Prince George's County*, 86 Md. App. 179, 191 (1991) (quoting 1 Edward H. Ziegler, *Rathkopf's The Law of Zoning and Planning* (4th ed. 1990)). A property located in an overlay zone is "simultaneously in two zones[,]" both the overlay zone and the underlying zone. *Cox v. Prince George's County*, 86 Md. App. at 183 n.1.

The D-D-O zone is one of several overlay zones established in the Prince

George's County zoning ordinance. *See* PGCC § 27-109(a)(7). The D-D-O zone "is intended to ensure that the development of land in a designated development district meets the goals established for the district in a Master Plan, Master Plan Amendment, or Sector Plan, and takes advantage of unique opportunities presented by the district." PGCC § 27-548.19. The D-D-O zone is "a mapped zone which is superimposed by a Sectional Map Amendment (SMA) over other zones in a designated development district, and may modify development requirements within the underlying zones." *Id.* In other words, the D-D-O zone is "placed over other zones on the Zoning Map, and may modify specific requirements of those underlying zones." PGCC § 27-548.21.

In its appellate brief, the City argues that the D-D-O zone does not satisfy the definition of a floating zone. The City emphasizes that floating zones have an "undetermined location" until a property owner applies for the floating zone classification. The City argues that the D-D-O zone, unlike a floating zone, is "a mapped zone that is demarcated on the relevant zoning map[.]" The City concludes that, because the D-D-O is not a floating zone, the decision here does not fit the floating zone exception to the change-mistake rule. In the City's view, the District Council "essentially crafted an alternative exception to the change-mistake rule," which, the City argues, is not recognized under Maryland case law.

In response, Werrlein insists that the D-D-O zone "is the very definition of a floating zone, in that it has no specific location, but allows property owners to apply for the designation[.]" Werrlein's suggestion that an owner of the subject property applied for the D-D-O zone designation is inaccurate. Neither Werrlein nor the previous owners

43

applied to designate the subject property as part of the D-D-O zone. The District Council placed the property in the D-D-O zone when it adopted the sectional map amendment in 2004, as part of the comprehensive rezoning of the development district covering the City of Hyattsville and other municipalities. The parcels were already in the D-D-O zone when, in 2018, Werrlein requested changes to the underlying Euclidean zones.

For its part, the District Council appears to recognize (at least tacitly) that the D-D-O zone does not meet the definition of a floating zone. The District Council observes that, in the second amended application, Werrlein asked to change the underlying zones of both parcels to the Mixed Use – Infill (M-U-I) zone, which the District Council says is a floating zone.[14] In the proceedings below, the District Council rejected the request for reclassification to the M-U-I zone and instead approved rezoning the lower parcel from the O-S zone to the R-55 zone and changing the list of allowed uses to permit townhouses. In this regard, the District Council argues that it followed the legislative "requirements to amend the Overlay zone" set forth in PGCC § 27-548.26(b). The District Council suggests that these requirements are sufficiently similar to the requirements of a floating zone application that the change-mistake rule should not govern this type of rezoning decision.

---

[14] The District Council cites PGCC § 27-546.16(b)(2), which states: "Property in the D-D-O zone may be reclassified from its underlying zone to the M-U-I Zone through the property owner application process in [PGCC §] 27-548.26(b). In the review process, the owner shall show that the proposed rezoning and development will be compatible with existing or approved future development on adjacent properties."

44

### C. Legislatively Created Criteria for Amendments in the D-D-O Zone

The record shows that the District Council made its decision under the premise that the relevant approval criteria were the criteria set forth in PGCC § 27.548.26(b) for approving amendments to the approved overlay zone, rather than the change-mistake requirement.[15]  As mentioned previously, PGCC § 27-548.26(b)(1)(B) provides that the owner of property in the approved development district overlay (D-D-O) zone may "request changes to the underlying zones or the list of allowed uses, as modified by the Development District Standards."  Such a request "may include requested amendments to the applicable Development District Standards for the applicable D-D-O Zone."  PGCC § 27-548.26(b)(1)(B)(ii).

To approve an application, the District Council must "find that the proposed development conforms with the purposes and recommendations for the Development District, as stated in the Master Plan, Master Plan Amendment, or Sector Plan, meets applicable site plan requirements, and does not otherwise substantially impair the implementation of any comprehensive plan applicable to the subject development

---

[15] During the second hearing before the District Council, one of the Eisen parties argued that the application should be denied because Werrlein made no showing that the District Council was "in error" when it rezoned the lower parcel during the 2004 comprehensive rezoning or that "the characteristics of the surrounding community ha[d] changed" since the comprehensive rezoning.  A staff member advised the District Council, however, that the change-mistake rule was inapplicable.  The staff member opined that the applicable criteria were those set forth in the County zoning ordinance for approving zoning changes for properties located in the development district overlay zone.  Specifically, the staff member advised the District Council "to look at whether or not" the requested zoning changes would "comport[] with the purposes and guidelines" for the development district.

45

proposal." PGCC § 27-548.26(b)(5). To approve requested "amendments to the Development District Standards," the District Council must "find that the amended standards will benefit the proposed development, will further the purposes of the applicable Development District, and will not substantially impair implementation of any applicable Master Plan or Sector Plan." PGCC § 27-548.26(b)(1)(B)(ii).

In sum, PGCC § 27-548.26(b) establishes specific criteria for approving certain zoning changes for properties located in the legislatively approved D-D-O zone, without any direct or indirect reference to a change-mistake requirement. On its face, this provision purports to authorize the District Council to change the underlying zone for a particular property in the D-D-O zone, without any need to show a change or mistake. This provision includes no indication that, in addition to these criteria, an applicant must also prove the existence of a change in the surrounding neighborhood or mistake in the existing zoning classification. The District Council's decision to ignore the change-mistake rule, in favor of the approval criteria set forth in PGCC § 27-548.26(b), appears correct, at least as far as it concerned the interpretation of the zoning ordinance.[16]

What the City calls an "exception to the change-mistake rule" was not simply conjured up during this quasi-judicial proceeding. The "exception" used here is part of

---

[16] Separate provisions of the zoning ordinance generally permit requests for piecemeal zoning map amendments in any "conventional zone." *See* PGCC § 27-143. The term "conventional zone" does not include overlay zones, such as the D-D-O zone. *See* PGCC § 27-109(c). In a conventional zone, the District Council may not approve a map amendment unless the applicant proves the existence of a "substantial change in the character of the neighborhood" or "a mistake" in either the "original zoning" or "current Sectional Map Amendment." PGCC § 27-157(a)(1).

46

the zoning ordinance itself, a defined feature of this particular overlay zone. When the District Council, acting in its legislative capacity, created the D-D-O zone classification in 2000, it also created this mechanism for changing the underlying zones and list of allowed uses for properties located in this overlay zone. *See* County Council for Prince George's County Bill 8, 2000 Legislative Session (CB-8-2000). This mechanism seems to be a legislatively created tool to provide flexibility. Indeed, one of the express purposes of the D-D-O zone is "[t]o provide flexibility within a regulatory framework to encourage innovative design solutions[.]" PGCC § 27-548.20(a)(2).[17] The provisions permitting certain zoning changes within the approved D-D-O zone sacrifice some of the stability of Euclidean zoning, in favor of advancing other goals for a particular development district, as set forth in a comprehensive plan for that district.

Because this mechanism is "legislatively-created within the comprehensive zoning

---

[17] The "specific purposes" of the D-D-O zone are:

(1) To provide a close link between Master Plans, Master Plan Amendments, or Sector Plans and their implementation;
(2) To provide flexibility within a regulatory framework to encourage innovative design solutions;
(3) To provide uniform development criteria utilizing design standards approved or amended by the District Council;
(4) To promote an appropriate mix of land uses;
(5) To encourage compact development;
(6) To encourage compatible development which complements and enhances the character of an area;
(7) To promote a sense of place by preserving character-defining features within a community;
(8) To encourage pedestrian activity; [and]
(9) To promote economic vitality and investment.

PGCC § 27-548.20(a).

regulatory scheme," it is entitled to a "presumption of correctness[.]" *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 542. It is not obvious why this mechanism should be seen as more objectionable than an ordinance creating a floating zone. The Court of Appeals' long-held rationale for upholding the use of floating zones, without any showing of change or mistake, has little to do with the fact that floating zones begin as unmapped zones. Rather, the Court of Appeals has upheld the use of floating zones because the Court has recognized that the process that a legislative body establishes for approving floating zone applications resembles, in important respects, the process for approving special exceptions. *See Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. at 540 n.15 (collecting cases).

The Court of Appeals originally approved the use of floating zones in *Huff v. Board of Zoning Appeals of Baltimore County*, 214 Md. 48 (1957).[18] In that case, the Court upheld the reclassification of a property from a residential classification to "Manufacturing, Restricted," a zoning classification created by the County government two years previously. *Id.* at 51. The local zoning ordinance authorized property owners to petition for the designation, subject to administrative review of development plans to ensure conformance with certain development standards and compatibility with the surrounding properties. *Id.* at 55-56. The Court reasoned that the enactment of an ordinance authorizing property owners to apply for the new zoning classification

---

[18] The *Huff* opinion does not use the term "floating" zone. Subsequent opinions explain that the type of zone analyzed in *Huff* was a floating zone. *E.g. People's Counsel for Baltimore County v. Loyola Coll. in Md.*, 406 Md. 54, 80 (2008); *Beall v. Montgomery County Council*, 240 Md. 77, 90-91 (1965).

48

"raise[d] a strong presumption that the [enactment] was correct[,]" and that the challengers bore the burden "to show . . . that it was wrong." *Id.* at 59.

The Court observed that the standards established for approval of the floating manufacturing zone were "as definite and specific and as extensive as those governing special exceptions . . . , if not more so[.]" *Huff v. Board of Zoning Appeals of Baltimore County*, 214 Md. at 62. The Court explained that, "as in the case of a special exception, there has been a prior legislative determination, as part of a comprehensive plan, that the use which the administrative body permits, upon application to the particular case of the specified standards, is *prima facie* proper for the environment in which it is permitted." *Id.* Accordingly, the Court concluded that "the Manufacturing, Restricted classification [was] analogous to a special exception," and that "the rules which are applicable to special exceptions . . . , not the general rules of original error or change in conditions of the character of the neighborhood, . . . control the propriety of rezoning." *Id.*

The Court of Appeals later gave the following summary of the rationale of *Huff* and the cases that followed *Huff*:

> The floating zone is different from the establishment of an Euclidean zone in that it is initiated on the instigation of a land owner within the district rather than that of the legislative body. While this opens an avenue of attack on the basis that the action is taken for the benefit of an individual land owner rather than for the good of the community as a whole, this criticism is blunted by the fact that the floating zone is subject to the same conditions that apply to safeguard the granting of special exceptions, i.e., the use must be compatible with the surrounding neighborhood, it must further the purposes of the proposed reclassification, and special precautions are to be applied to insure that there will be no discordance with existing uses. These precautions include such restrictions as building location and style, the percentage of the area covered by the building, minimum green area, minimum and maximum area of the use, minimum

49

setback from streets and other uses, requirement that a site plan be approved, and a provision for revocation of the classification if the specified restrictions are not complied with.

*Bigenho v. Montgomery County Council*, 248 Md. 386, 391 (1968).

The mechanism used here, PGCC § 27-548.26(b)(1)(B), permits changes to the underlying zone or list of allowed uses for properties in the approved D-D-O zone, an area predetermined by the legislative body, provided that the proposed changes meet certain standards. Specifically, an application may not be approved unless the District Council finds "that the proposed development conforms with the purposes and recommendations for the Development District, as stated in the Master Plan, Master Plan Amendment, or Sector Plan, meets applicable site plan requirements, and does not otherwise substantially impair the implementation of any comprehensive plan applicable to the subject development proposal." PGCC § 27-548.26(b)(5). If granted, the zoning change affects only the underlying zone of the property; the property remains in the D-D-O zone, subject to the requirements of that zone. Consequently, new development on the property remains subject to the approval of a detailed site plan, to ensure compliance with the applicable development standards. Overall, this process incorporates safeguards designed to ensure that zoning changes approved under this process will be in accordance with the applicable comprehensive plans and will be compatible with the surrounding neighborhood.

We conclude that the process that the District Council has established for approving certain amendments in the D-D-O zone is sufficiently analogous to the process for applying for a floating zone or special exception that it is an appropriate exercise of

50

the District Council's zoning powers.  Accordingly, the District Council did not err when it evaluated the application under the criteria set forth in PGCC § 27-548.26(b), instead of requiring a showing of either a change in the surrounding area or mistake in the existing zoning classification.

### III.     Role of the Sector Plan in the Rezoning Decision

In a separate argument, the City of Hyattsville observes that the 2004 sectional map amendment rezoned the lower parcel from the R-55 (One-Family Detached Residential) zone to the O-S (Open Space) zone.  The City argues that the subsequent decision to rezone the lower parcel to the R-55 zone and to allow townhouses on the property is "inherently inconsistent" with the 2004 sector plan.

In its appellate brief, the City quotes various statements from the sector plan describing the "traditional residential neighborhood (TRN) character area" of the Gateway Arts District.  For instance, the sector plan states that "[t]raditional residential neighborhood character areas overlay land zoned for attached and detached single-family housing development."  2004 Approved Sector Plan and Sectional Map Amendment, at 138.  The "[g]oal[s]" of this character area are: to "promote development of both family- and artist-oriented residential development in the R-55, R-35, R-20, and R-T Zones"; to "preserve the single-family residential neighborhood character as the anchor of the Arts District, while supporting artists who produce and teach from their homes"; and to "enhance the 'built-in' natural surveillance of public areas by active neighbors on porches, in yards, and on the sidewalk."  *Id.*  According to the sector plan, "[t]his development character reinforces the existing single-family detached residential

51

neighborhoods as calm, low-traffic, and child-safe." *Id.* The City contends here that rezoning the subject property from O-S to R-55 and allowing townhouses on the property contravenes the "intent" of the sector plan, as described in these and other statements.

The City does not elaborate on its premise that a purported "inconsisten[cy]" between a piecemeal rezoning decision and a sector plan is, by itself, a ground to reverse that decision. In the context of land-use regulation, "plans, which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statu[t]es or local ordinances linking planning and zoning." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 530 (2002). "Proposals for land use contained in a plan" such as the 2004 sector plan "constitute a non-binding advisory recommendation, unless a relevant ordinance or regulation, or specific zoning, subdivision, or other land use approval, make compliance with the plan recommendations mandatory." *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 522 (2015) (citing *Maryland-National Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 98-101 (2009)).

The City's appellate brief does not identify any provision of the local zoning ordinance which might make the "intent" of the sector plan the controlling factor in subsequent rezoning decisions. In its reply brief, however, the City calls attention to PGCC § 27-548.26(b)(5), which sets forth criteria for approving applications to change the underlying zone or list of allowed uses for properties located in the D-D-O zone. This provision defines a specific role for the sector plan in the application process.

As mentioned previously, PGCC § 27-548.26(b)(5) states that, to approve an

52

application and site plan, the District Council must "find that the proposed development conforms with the purposes and recommendations for the Development District, as stated in the Master Plan, Master Plan Amendment, or Sector Plan, meets applicable site plan requirements, and does not otherwise substantially impair the implementation of any comprehensive plan applicable to the subject development proposal."  Similarly, PGCC § 27-548.26(b)(1)(B)(ii) states that, to approve any requested amendments to the Development District Standards, the District Council must "find that the amended standards will benefit the proposed development, will further the purposes of the applicable Development District, and will not substantially impair implementation of any applicable Master Plan or Sector Plan."

In its final decision, the District Council made express findings that the requested zoning changes and proposed development satisfied the criteria set forth in these two provisions.  The District Council stated that rezoning the lower parcel and "allow[ing] 9 dwelling units per acre . . . for single-family attached units and 6.7 dwelling units per acre (as permitted in R-55) for single-family detached units" would "benefit the proposed development," would "further the purposes of the Development District," and would "not substantially impair the implementation" of the 2004 sector plan or the applicable master plan.  The District Council further concluded that "rezoning a portion of the property to R-55, to facilitate R-55 development of the entire 8.26 acres," would "further the purposes of the development district," would "conform with the purposes and recommendations for the development district," would "satisf[y] the site design guidelines[,]" and would "not otherwise substantially impair the implementation" of the

53

2004 sector plan or the applicable master plan.

In explaining those conclusions, the District Council stated that, in general, "R-55 zoning is recommended for any infill development that will preserve the traditional single-family residential neighborhood character in the [traditional residential neighborhood] area."  The District Council observed that the subject property sits between neighboring properties with three types of existing uses: detached single-family residences, multi-family apartment buildings, and a public park.  The District Council reasoned that rezoning the lower parcel to R-55 would "allow redevelopment of an under-utilized property into a residential subdivision, with a mix of single-family detached and attached dwelling units" which would "be compatible with the surrounding neighborhood."  The District Council emphasized that the proposal stood in "stark contrast to the abandoned WSSC headquarters and parking lot" already located on the subject property, which was "not compatible with the surrounding residential neighborhood."

The City of Hyattsville disagrees with the District Council's conclusions, asserting that the decision to approve the application "impairs the implementation of the Sector Plan" and is "inconsistent with the Sector Plan's goals, purposes, and recommendations." When reviewing zoning decisions, however, "the reviewing court should not 'zone or rezone or [] substitute its judgment for that of the zoning authority if the action of the zoning authority is based on substantial evidence and the issue is thus fairly debatable.'" *Cremins v. County Comm'rs of Washington County*, 164 Md. App. 426, 438 (2005) (quoting *Montgomery County v. Greater Colesville Citizens' Ass'n*, 70 Md. App. 374,

54

381 (1987)) (further quotation marks omitted). "There is substantial evidence to support the zoning agency's conclusion if 'reasoning minds could reasonably reach [the] conclusion from facts in the record[.]'" *Cremins v. County Comm'rs of Washington County*, 164 Md. App. at 438 (quoting *Stansbury v. Jones*, 372 Md. 172, 182-83 (2002)).

In our assessment, it was at least fairly debatable that the requested zoning changes and proposed development would conform with the purposes and recommendations for the development district, as stated in the sector plan, and would not otherwise substantially impair the implementation of the sector plan. It is obvious that assigning a property to the R-55 zone is compatible with the goal of "promot[ing] development of both family and artist-oriented residential development in the R-55" zone. It is equally obvious that a proposal to replace a vacant government building and parking lot with single-family homes directly advances the goal of promoting single-family residential development. The sector plan expressly mentions that the traditional residential neighborhood character area includes "land zoned for attached and detached single-family housing development." 2004 Approved Sector Plan and Sectional Map Amendment, at 138. In addition, the Development District Standards for the traditional residential neighborhood character area include specific standards for townhouses. Accordingly, adding townhouses to the list of allowed uses, so as to permit the development of a mix of both detached single-family houses and townhouses, does not

inherently conflict with the vision described in the sector plan.[19]  Based on the evidence

presented, one could reasonably conclude that Werrlein's proposal would advance the

goals and recommendations outlined in the sector plan for this area.

Arguing for a contrary conclusion, the City focuses on one specific statement from

the 2004 Approved Sector Plan and Sectional Map Amendment.  The "Implementation"

part of that document includes a "Sectional Map Amendment" section, which made

zoning changes to various properties in the Gateway Arts District.  The stated rationale

for rezoning the lower parcel at that time was: "Rezoning to O-S creates the opportunity

to expand parkland and reinforce the vision of the traditional residential neighborhood

character area [of the Gateway Arts District]."  2004 Approved Sector Plan and Sectional

Map Amendment, at 123.

This statement is more accurately regarded as part of the sectional map

amendment, which implements the sector plan, rather than part of the sector plan itself.

In any event, in assessing Werrlein's application, the District Council concluded that the

proposal was consistent with the goal of expanding parkland.  The District Council noted

that the development proposal specified that, "[w]hen rezoned to R-55, *only* 2.8 acres" of

the lower parcel "w[ould] be developed with dwelling units[,]" and that Werrlein would

"transfer the remaining 1.8 acres of the parcel to the City of Hyattsville for open

space/parkland[.]"  (Emphasis in original.)  The District Council reasoned that this aspect

---

[19] The District Council characterized the townhouses as a "transition" area of sorts, between the existing multi-family apartment buildings on one side of the subject property and the existing detached single-family homes on another side of the subject property.

of the development proposal would "implement the Plan's vision to expand parkland and reinforce the vision of the traditional residential neighborhood character area." That conclusion was at least fairly debatable.

The City of Hyattsville also contends that, in deciding to change the zoning classification of the lower parcel, the District Council "failed to give adequate weight to the presumption that the zoning designations" established by the comprehensive rezoning "were correctly determined and valid."[20] This argument misapprehends the role that the presumption of correctness plays in the process established by PGCC § 27-548.26(b). In this context, the effect of the presumption of correctness is simply that the applicant bears the burden of affirmatively establishing that any proposed zoning changes meet the criteria for approval set forth in the zoning ordinance. The District Council's express findings that Werrlein's proposal met the criteria set forth in PGCC § 27-548.26(b)(5) and (b)(1)(B)(ii) serve as a finding that Werrlein had overcome the presumption of correctness. The District Council here, by focusing its decision on those criteria, properly employed the presumption of correctness.[21]

---

[20] The City offers no hint as to what kind of showing would, in the City's view, be adequate to rebut the presumption of correctness, short of a showing of a change since the comprehensive rezoning or a mistake in the comprehensive rezoning. The City's argument about the presumption of correctness appears to be little more than a restatement of the argument that the applicant was required to show a change or mistake.

[21] To be more exact, the presumption of correctness plays multiple roles here. One must presume that the District Council was correct when it assigned the lower parcel to the O-S zone in 2004. One must also presume that the District Council was correct when it assigned the property to the D-D-O zone during that same 2004 rezoning. Furthermore, one must presume that the District Council was correct when, in 2000, it enacted the ordinance creating the procedure for making certain changes in the approved D-D-O

57

Ultimately, the District Council's conclusions withstand scrutiny under the standard for judicial review of administrative decisions. Based on the evidence presented, the District Council could reasonably conclude that rezoning the lower parcel and changing the list of allowed uses would conform with the purposes and recommendations for the development district, as stated in the sector plan, and would not substantially impair the implementation of the sector plan. Because substantial evidence in the record supported those conclusions, there is no basis for a court to substitute its judgment for that of the District Council.

## IV.     Change to List of Allowed Uses and Density Regulations

In their appeal, the Eisen parties contend that the District Council violated the Prince George's County zoning ordinance by allowing the development of townhouses on the subject property and by allowing a density of nine dwelling units per acre for townhouses. They present a two-tiered challenge to those decisions:

1.      Did the District Council's decision to authorize development of 72 dwelling units including Townhouses, at up to nine (9) units per gross acre, violate the Zoning Ordinance?

    A.      If both properties are zoned R-55, did the decision to authorize 72 dwelling units including Townhouses, at up to nine (9) units per gross acre, violate the Zoning Ordinance?

    B.      If the rezoning of the lower parcel to R-55 was unlawful and the parcel remains in the O-S zone, did the decision to authorize 72

---

zone. The 2004 decision that the lower parcel should have an overlay zone of D-D-O and an underlying zone of O-S necessarily includes a decision that the underlying O-S zone was subject to the change if the property owner could show that the change would satisfy the criteria set forth in PGCC § 27-548.26(b).

58

dwelling units including Townhouses, at up to nine (9) units per gross acre, violate the Zoning Ordinance?

Although the Eisen parties assert that the District Council's decision to rezone the lower parcel was "unlawful," the Eisen parties provide no independent argument in support of that position. To the extent that the Eisen parties are challenging the rezoning of the lower parcel, they appear to rely on arguments made by the City of Hyattsville. For the reasons discussed above, we have rejected the City's challenges to the rezoning decision. Consequently, we need not address the portions of the Eisen parties' argument that presume that rezoning the lower property to the R-55 zone is invalid.

A.     **Authority to Change List of Allowed Uses and Density Regulations**

The Eisen parties focus not on the zoning change itself, but on the decisions to change the list of allowed uses and to modify the density regulations. The Eisen parties contend that, if both parcels have an overlay zone of D-D-O and an underlying zone of R-55, then the property remains "subject to the use and density limitations" of the R-55 zone. According to the Eisen parties, the Development District Standards of the D-D-O zone simply "do not apply" to the subject property, because of a special exemption in the enactment creating the D-D-O zone. Under their theory, even though the zoning ordinance generally authorizes changes to the list of allowed uses and density regulations for properties in the D-D-O zone, that provision does not authorize those types of changes for this particular property.

Under the Prince George's County zoning ordinance, "Development District Standards" of a D-D-O zone serve as the means through which the District Council may

modify development requirements of the underlying zone. These Development District Standards must be stated in the sectional map amendment establishing the D-D-O zone. PGCC § 27-548.24(c). The enactment establishing the D-D-O zone must incorporate a "table of uses . . . showing all uses in the underlying zone that will be permitted, prohibited, or otherwise restricted" through those Development District Standards. PGCC § 27-548.22(f).

For properties in the D-D-O zone, the uses allowed on the property and other regulations, including density regulations, are the same as those of the underlying zone, except as modified by the Development District Standards. PGCC §§ 27-548.22(a), 27-548.23(a). "Development District Standards may allow uses prohibited in the underlying zone where the uses are compatible with the goals of the Development District and purposes of the D-D-O Zone." PGCC § 27-548.22(e). To achieve the goals of the development district and the purposes of the D-D-O zone, Development District Standards "may modify density regulations" of the underlying zone, may specify "location, size, height, design, lot coverage of structures, parking and loading, signs, open space, and other regulations," and may include requirements for "specific landscaping, screening, and buffering[.]" PGCC § 27-548.23(b)-(d).

The 2004 enactment establishing the Gateway Arts District D-D-O zone includes a section titled "Development District Standards." 2004 Approved Sector Plan and Sectional Map Amendment, at 135-56. This section of the document includes a 13-page table of "Standards" for each character area of the development district, which are organized into standards for "Site Design," "Building Design," and "Public Space." *Id.*

60

at 144-56.  To use one example, the site design standards for the traditional residential neighborhood character area state that townhouses "shall have a minimum lot width of 18 feet and shall not front a parking lot."  *Id.* at 146.  To use another example, the building design standards for the traditional residential neighborhood character area state that the "maximum height of townhouse buildings shall be 45 feet."  *Id.* at 151.

A separate section of the document is titled "Uses Permitted."  2004 Approved Sector Plan and Sectional Map Amendment, at 167-99.  This section includes a table specifying whether a particular use is permitted, permitted with a special permit, or prohibited in each character area.  For instance, one-family detached dwellings are generally permitted throughout the traditional residential neighborhood character area. *Id.* at 195.  Townhouses are permitted in the traditional residential neighborhood character area if that use is allowed in the underlying zone.  *Id.* at 196.  In the present case, the District Council granted a request to change the list of allowed uses, so as to allow townhouses on the subject property.

In their appeal, the Eisen appellants rely heavily on a footnote attached to the top line of the table of "Standards" for this D-D-O zone.  The footnote states: "R-55 zoned properties in the TRN character area within the incorporated City of Hyattsville are exempt from the development standards and will abide by the requirements of the R-55 Zone."  2004 Approved Sector Plan and Sectional Map Amendment, at 144 n.2.  The Eisen parties refer to this footnote as the "Hyattsville Exemption."  The Eisen parties assert that, after the rezoning of the lower parcel, the entire subject property qualifies for this exemption, because it: has an underlying zoning classification of R-55; is located in

the traditional residential neighborhood character area of the D-D-O zone; and is located within the City of Hyattsville.

The Eisen parties theorize that this footnote reaches far beyond the "Standards" table in which it appears. According to their theory, this exemption from certain "development standards" means that properties qualifying for the exemption are exempt from any "Development District Standards," as that term is used in the zoning ordinance. They further argue that, if a property qualifies for this exemption, then the District Council may not use those Development District Standards to change the allowed uses or to modify the density regulations on those properties. They conclude that, because the subject property fits within this exemption, the District Council cannot change the list of allowed uses or modify the density regulations for the subject property.

In response to these arguments, the District Council argues that the Eisen parties overstate the significance of the footnote in question. The District Council argues that the exemption set forth in the footnote "*only* applies" to the development standards for "*site design, building design*, and *public space—not what **uses** or **density** are permitted in the table of uses*." (Emphasis in original.) We agree.

In our assessment, the expansive interpretation of the footnote offered by the Eisen parties is implausible. The footnote states that certain properties "are exempt from the development standards," but it does not say that those properties are exempt from the "Development District Standards," a term that is defined in the zoning ordinance.[22] The

___

[22] By contrast, the introduction to the Development District Standards section lists ten specific "exemptions from the development district standards." 2004 Approved

62

footnote appears within a 13-page table of "Standards," which address three categories: "Site Design," "Building Design," and "Public Space." The standards included on the table do not address the allowed uses of a property, nor do they include any density regulations. Rather, a separate section sets forth the "Uses Permitted" in each character area. When read in proper context, the phrase "the development standards" in the footnote of the "Standards" table refers to the particular standards listed on that table. It would be a mistake to equate the phrase "the development standards," as used in that context, to encompass the entire category of "Development District Standards," within the meaning of the zoning ordinance.

Moreover, even if the footnote did exempt certain properties from the "Development District Standards" of the D-D-O zone, this exemption would not prohibit the District Council from lifting the exemption. The footnote itself is not part of the zoning ordinance. The footnote is included in a table within the Development District Standards established for this D-D-O zone. The zoning ordinance authorizes the District Council to approve "amendments to the Development District Standards" (PGCC § 27-548.26(b)(1)(B)) if the District Council finds that an applicant has satisfied certain criteria. Logically, this authority to amend the Development District Standards includes the ability to amend a footnote that is included within those Development District Standards.

_____

Sector Plan and Sectional Map Amendment for the Prince George's County Gateway Arts District, at 140. The so-called Hyattsville exemption does not appear on that list. *See id.* at 140-42.

In fact, in this case, the District Council decided to lift the exemption from the property entirely: the District Council decided that, before the issuance of any building permit, Werrlein would be required to obtain approval of a detailed site plan, at which point the property would be "subject to all Development District Overlay (D-D-O) standards applicable to the Traditional Residential Neighborhood Character Area."[23]  In doing so, the District Council treated the exemption as subject to change through the application process under PGCC § 27-548.26(b).  We perceive no error in this aspect of the decision.

Accordingly, we reject the contention that the footnote in question operates to prohibit changes to the list of allowed uses or to density regulations.  The District Council was authorized to change the list of allowed uses for the subject property to include townhouses, provided that the District Council found that the proposal met the criteria listed in PGCC § 27-548.26(b)(5).  The District Council was authorized to amend the Development District Standards, in order to modify the density regulations for the subject property, provided that the District Council found that the proposal met the criteria listed in PGCC § 27-548.26(b)(1)(b)(ii).  Here, the District Council made those requisite findings.

B.    **Modification of Density Regulations**

The Eisen parties further observe that, to the extent that the District Council might

---

[23] The District Council had previously acknowledged the existence of the exemption in its order of remand, which was incorporated by reference into the final decision.

modify the density regulations applicable to the subject property, the District Council still must comply with another limitation from the zoning ordinance. PGCC § 27-548.23(b) states: "Development District Standards may not permit density in excess of the maximum permitted in the underlying zone." In its final decision here, the District Council decided to allow "9 dwelling units per acre . . . for single-family attached units" and "6.7 dwelling units per acre . . . for single-family detached units." The Eisen parties argue that both of these densities exceed the maximum density permitted in the underlying R-55 zone.

The Eisen parties cite PGCC § 27-442(h), which sets forth density regulations for properties in each residential zone of the County zoning ordinance. That table expresses each density as the "Maximum Dwelling Units Per Net Acre of Net Lot/Tract Area." *Id.* In the R-55 zone, the maximum density for "[o]ne-family detached dwellings, in general" is 6.7 dwelling units per net acre of net lot or tract area. *Id.* The table includes a separate category for "Townhouses," but it assigns no value for the maximum density of townhouses in the R-55 zone (*id.*), apparently because that use generally is not permitted in the R-55 zone, subject to only a few narrow exceptions. *See* PGCC § 27-441(b).

In its decision here, the District Council appeared to recognize that the density for single-family detached dwelling units could not exceed the maximum density permitted in the underlying R-55 zone. The District Council expressed this maximum density as "6.7 dwelling units per acre[.]" The Eisen parties point out, however, that this statement does not accurately express the maximum density permitted in the R-55 zone, which is 6.7 single-family detached dwelling units per *net acre* of net lot or tract area.

The Eisen parties explain that, throughout the zoning ordinance, "[d]ensity" means the "number of 'Dwelling Units' per acre of 'Net Lot Area.'"  PGCC § 27-107.01(a)(66). The term "Net Lot Area" is defined as the "total contiguous area" of a lot "excluding: (i) 'Alleys,' 'Streets,' and other public ways; and (ii) Land lying within a 'One Hundred (100) Year Floodplain[.]'"  PGCC § 27-107.01(a)(161).  The Eisen parties observe that, throughout its written decisions, the District Council never expressed density in terms of dwelling units per net acre.  The Eisen parties further note that, whenever the District Council discussed the acreage of the property, the District Council uniformly referred to estimates of the total area of the property, which includes at least one public street, as well as land lying within the 100-year floodplain.

The Eisen parties conclude that the District Council's decision to allow "6.7 dwelling units per acre" exceeds the maximum allowed density of 6.7 dwelling units per *net acre* of net lot or tract area.  If the District Council's decision is read literally to allow "6.7 dwelling units per acre," and not 6.7 dwelling units per *net acre* of net lot or tract area, we must agree with the Eisen parties.  The District Council erred in failing to express the maximum density for one-family detached dwellings as 6.7 dwelling units per net acre of net lot or tract area.  In their respective appellate briefs, neither the District Council nor Werrlein provide any defense of this aspect of the decision.

In its final decision, the District Council also decided to modify the applicable density regulations "to allow 9 dwelling units per acre" for townhouses.  The Eisen parties argue that this modification also exceeds the maximum density permitted in the R-55 zone.  According to the Eisen parties, the "maximum density" or "maximum

66

residential density" in the R-55 zone is 6.7 dwelling units per net acre, under PGCC § 27-442(h). These assertions are not exactly correct.

Under PGCC § 27-442(h), there is no singular "maximum density" or "maximum residential density" in the R-55 zone. The density allowed for a particular type of dwelling unit varies based on the type of dwelling. The table of density regulations lists "One-family detached dwellings, in general" and "Townhouses" in separate categories. For some residential zones, the maximum density for one-family detached dwellings differs from the maximum density for townhouses.[24] Thus, it is incorrect to say that 6.7 dwelling units per net acre is the maximum density for townhouses in the R-55 zone. Strictly speaking, the zoning ordinance defines no maximum density for townhouses in the R-55 zone. As the District Council states in its brief, the decision here did not exceed the maximum density for townhouses in the zoning ordinance, because the ordinance includes no maximum density to exceed for townhouses.

Under circumstances such as these, where the District Council adds a type of dwelling unit to the list of allowed uses, and where the underlying zone establishes no maximum density for that type of dwelling unit, the District Council must establish one in the first instance. Otherwise, the District Council's authority under PGCC § 27-

_____

[24] For instance, in the R-20 zone, the maximum density for one-family detached dwellings is 6.7 dwelling units per net acre, but the maximum density for townhouses is 16.33 dwelling units per net acre. PGCC § 27-442(h). In the R-T, R-30, R-30C, R-18, and R-18C zones, the maximum density for one-family detached dwellings is 6.7 dwelling units per net acre, but the maximum density for townhouses is 6.0 dwelling units per net acre (or 8.0 dwelling units per net acre for certain townhouses approved before November 1, 1996). *Id.* In the R-T zone, the maximum density in the "Townhouse, Transit Village" category is 12.0 dwelling units per net acre. *Id.*

548.26(b) to amend the list of allowed uses might be rendered nugatory. In establishing such a maximum density, one governing limitation is that the District Council "may modify density regulations only to meet the goals of the Development District and the purposes of the D-D-O Zone." PGCC § 27-548.23(b). In addition, to amend Development District Standards to set a new maximum density where the zoning ordinance prescribes none, the District Council must find that "the amended standards will benefit the proposed development, will further the purposes of the applicable Development District, and will not substantially impair implementation of any applicable Master Plan or Sector Plan." PGCC § 27-548.26(b)(1)(B)(ii).

The Eisen parties make no direct challenge to the District Council's express finding that allowing a density of "9 dwelling units per acre" for townhouses satisfied the criteria for approving amendments to the Development District Standards. Nevertheless, the Eisen parties have established at least one error in the decision to establish a maximum density for townhouses. The density that the District Council establishes for townhouses should be expressed as a specific number of dwelling units per net acre of net lot or tract area. *See* PGCC §§ 27-107.01(a)(66), 27-442(h). The District Council erred to the extent that it approved a density in terms of "dwelling units per acre" rather than "net acre," as required by the zoning ordinance. This error may be significant for a property on which the number of net acres may be substantially less than the total acreage of the property.

The Eisen parties contend that the District Council's error in expressing density as a number of dwelling units "per acre" is sufficient to require a reversal of the decision.

68

Their adversaries dispute that contention. Werrlein asserts that the District Council's decision regarding density was not "set-in-stone" but "just the first phase of a three-stage process." Werrlein assures us that additional "details" will be "filled in through the preliminary plan of subdivision process and the detailed site plan[] process[.]"

In its brief, the District Council informs us that some of these processes have already taken place. The District Council asks this Court to take judicial notice of subsequent developments regarding Werrlein's proposed development on the subject property.[25] In April 2020, the Planning Board approved a preliminary plan of subdivision for the development of "15 single-family detached dwelling units" and "15 townhouses" on the upper parcel, with conditions for approving an additional dwelling unit. A petition for judicial review of that decision is currently pending in the circuit court in a separate case. In June 2020, the Planning Board approved a detailed site plan for the development of "15 single-family attached units and 16 single-family detached units" on the upper parcel. The District Council later upheld that decision, and no action for judicial review of the detail site plan decision remains pending.

The District Council suggests that these subsequent decisions regarding the upper parcel may have eliminated some of the grounds for the Eisen parties' density objections. As we see it, however, the ongoing nature of the development approval process demonstrates why the error in establishing the maximum density for the subject property

---

[25] In an appendix to its brief, the District Council included copies of various documents related to subsequent decisions by the Planning Board and the District Council. This Court may take judicial notice of the adjudicative facts reflected in those official public documents. *See Chesek v. Jones*, 406 Md. 446, 456 n.8 (2008).

must be corrected.  The decision under review here establishes the maximum densities that may be allowed on the entire subject property, not just the upper parcel.  At all subsequent stages for approval of Werrlein's proposed development, on either parcel, the administrative decision-makers will determine whether the proposed development actually conforms with the maximum densities established by the District Council's zoning decision.  Unless corrected, the error here in overstating the density allowed on the property may continue to affect each subsequent decision.[26]

In sum, although the zoning ordinance authorized the District Council to change the list of allowed uses and to modify density regulations for the property, the District Council erred by approving densities in terms of dwelling units "per acre" instead of net acre.  On remand, the District Council must establish densities for one-family detached residences and for townhouses, expressed as a number of dwelling units per net acre of net lot or tract area.

CONCLUSION

For the reasons stated in this opinion, the District Council's decision must be affirmed in part, but not in its entirety.  The decision must be affirmed insofar as it changed the underlying zone of the upper parcel from the O-S zone to the R-55 zone.  The decision must also be affirmed insofar as it changed the list of allowed uses to allow townhouses on the subject property.

---

[26] The final approval of the detailed site plan for the upper parcel includes a condition that, "[p]rior to certification," the detailed site plan must be revised to "[p]rovide a correct Density Calculation Table, in accordance with the approved Conceptual Site Plan" that is under review here.

The decision must be reversed to the extent that it modified the density regulations on the subject property to allow "6.7 dwelling units per acre . . . for single-family detached units" and "9 dwelling units per acre . . . for single-family attached units." The District Council may not allow a density for one-family detached dwelling units that exceeds 6.7 dwelling units per net acre of net lot or tract area. The District Council may establish a density for townhouses that is different from the density for one-family detached dwelling units, but the District Council may do so only to meet the goals of the Development District and the purposes of the D-D-O Zone. The density that the District Council establishes for townhouses must be expressed as a number of dwelling units per net acre of net lot or tract area.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED. CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE DISTRICT COUNCIL IN PART, REVERSE THE DECISION IN PART, AND REMAND THE CASE TO THE DISTRICT COUNCIL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY THE CITY OF HYATTSVILLE, 25% BY THE EISEN APPELLANTS, 12.5% BY PRINCE GEORGE'S COUNTY, AND 12.5% BY WERRLEIN WSSC, LLC.**

71

## APPENDIX A



CITY 0081

## **APPENDIX B**



CITY 0082

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1261s20cn.pdf